# Exhibit 1

Deposition of Joshua Allen Cole
Weigle v. Pifer, et al.
Case No. 2:14-cv-15087

Sheet 1  Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT PARKERSBURG

JAMES P. WEIGLE,

          Plaintiff,

v.                    Case No. 2:14-cv-15087

R. L. PIFER, individually and
in his capacity as an officer
with the City of Vienna Police
Department, et al.,

          Defendants.


       The deposition of JOSHUA ALLEN COLE was taken pursuant to the Federal Rules of Civil Procedure in the above-entitled action, on the 7th day of April, 2015, commencing at 9:57 a.m. and concluding at 11:48 a.m., at the City of Vienna Fire Department, 609 28th Street, Vienna, Wood County, West Virginia, before Shelia Miller, Certified Court Reporter, duly certified by the West Virginia Supreme Court of Appeals, and Notary Public in and for the State of West Virginia.

Deposition of Joshua Allen Cole
Weigle v. Pifer, et al.
Case No. 2:14-cv-15087

**Sheet 8 Page 26**

1 people who were on the streets?
2   A   People in their cars in the line.
3   Q   How many people did you ask before you
4 got to Mr. Weigle?
5   A   I don't remember.
6   Q   One, two?
7   A   I don't know.
8   Q   You've got three blocks of cars there.
9   A   I really couldn't tell you. I don't
10 know. It was more than one.
11   Q   Less than ten?
12   A   Yes, definitely less than ten.
13   Q   We are narrowing it down then, okay.
14   A   I would say maybe two to three, four.
15   Q   They kept saying it wasn't me and
16 pointing?
17   A   Pointing behind them.
18   Q   So you get to Mr. Weigle's car. What
19 kind of car was it?
20   A   A silver Smart Car, I believe.
21   Q   Had you ever seen a Smart Car before
22 then?
23   A   Yes.
24   Q   How many times?

**Page 27**

1   A   I don't know -- a few.
2   Q   I have never seen one actually, so I was
3 just wondering. They are relatively new cars, aren't
4 they?
5   A   I think so. I don't think they have
6 been around
7   Q   Not real common?
8   A   Right, correct.
9   Q   So you walk up to the car and what is
10 the first thing that you do?
11   A   I asked him if he was the one honking
12 his horn.
13   Q   Did you introduce yourself or did you
14 say hi or good afternoon, or did you just walk right up
15 and say, are you honking the horn?
16   A   I am not sure. I may have said hello or
17 how are you doing. I don't know.
18   Q   Then you said -- tell me exactly what
19 you said.
20   A   I believe I asked if he was the one
21 honking his horn. I know I for sure said that.
22   Q   Then he responded?
23   A   That he was.
24   Q   Then what happened?

**Page 28**

1   A   I think I asked him why he was honking
2 his horn, and he said he was -- he basically expressed
3 that he was angry that we were holding up traffic and that
4 people had businesses to run and places to be.
5   Q   That is rather reasonable, don't you
6 think?
7   A   It is.
8   Q   Then what happened?
9   A   He continued to express that he thought
10 it was, I am not sure of the exact words, but dumb that
11 people were out there running in the rain and we were
12 holding traffic for them.
13   Q   Did Mr. Weigle appear to be intoxicated
14 in any way?
15   A   No, I don't believe so.
16   Q   Did he appear to be under the influence
17 of anything?
18   A   I don't believe so.
19   Q   He was just a guy in a car frustrated
20 because he was stuck in traffic waiting for the runners?
21   A   Correct, he seemed very agitated that he
22 couldn't get to where he was trying to get to.
23   Q   Had the runners gone by yet on Grand
24 Central? Where were they running? Had they gone by?

**Page 29**

1 Were you waiting for them to come or had they already
2 passed or what was --
3   A   The race was ongoing. There were
4 different people -- there was a walking portion, a running
5 portion, and different people were let out at different
6 times. So there were various times they were on and off.
7   Q   Do you remember what stage this was?
8   A   I do not know where we were in the race
9 when this happened.
10   Q   What time of day was this? I was trying
11 to recall.
12   A   It was morning.
13   Q   So Mr. Weigle is just complaining
14 because he can't get to where he needs to go because of
15 the race?
16   A   That is correct.
17   Q   That is really not unreasonable, is it?
18   A   No.
19   Q   For someone to feel frustrated because
20 they are stuck in traffic?
21   A   That is correct.
22   Q   Then what happens?
23   A   I asked him if he was going to stop
24 honking his horn.

Shelia Miller, Certified Court Reporter
(304) 757-6455

Deposition of Joshua Allen Cole
Weigle v. Pifer, et al.
Case No. 2:14-cv-15087

Sheet 9   Page 30

1  Q  What did he say?
2  A  He said he was not going to stop honking
3  his horn.
4  Q  He said he was going to continue honking
5  the horn?
6  A  He just said, no, I am not going to stop
7  honking my horn.
8  Q  Then what happened?
9  A  I believe at that point, I asked him to
10 pull over if he wasn't going to stop honking his horn.
11 Q  Was he moving in traffic or was he
12 stopped in traffic?
13 A  While I was talking to him, he was
14 stopped.
15 Q  Now, he was on Grand Central Avenue?
16 A  Correct.
17 Q  That is what, two lanes, three?
18 A  There is a lane and then a parking lane.
19 Q  Which lane was he in?
20 A  In the driving lane.
21 Q  The traffic was stopped and backed up,
22 correct?
23 A  Correct.
24 Q  So he wasn't moving at all when you

Page 31

1  stopped him?
2  A  He was already stopped in traffic, that
3  is correct.
4  Q  Then you wanted him to pull over --
5  A  That is correct.
6  Q  -- into the parking lot?
7  A  Correct.
8  Q  Why did you want him to pull over?
9  A  So that he could be given a citation.
10 Q  What were you going to cite him for?
11 A  Illegal use of a horn and disturbing the
12 peace. Either one could have been issued.
13 Q  Have you ever issued either of those
14 citations before?
15 A  Have I?
16 Q  Yes.
17 A  I may have issued a disturbing the
18 peace. I don't know that I have ever cited anyone for a
19 horn honking.
20 Q  Then what happened?
21 A  He continued to refuse. At that point,
22 I called over Sergeant Pifer.
23 Q  How did you -- first of all, you said he
24 continued to refuse to stop honking the horn or continued

Page 32

1  to refuse to pull over?
2  A  Continued to refuse to pull over.
3  Q  Now, when you say you called Sergeant
4  Pifer, did you go get him? Did you leave and go get him?
5  Did you call him on the radio? How did you get him?
6  A  We were in sight of each other. I
7  walked up a few car lengths and motioned for him to come
8  towards me.
9  Q  Then what happened?
10 A  I told him that this gentleman said he
11 wasn't going to stop honking his horn and he was refusing
12 to pull over and asked him what he wanted to do.
13    He told me to go direct traffic so the
14 intersection wasn't left unattended and that he would
15 speak with him.
16 Q  So where was Sergeant Pifer when you had
17 this conversation with him?
18 A  Well, I called and he walked to me.
19 Q  Where was he whe he was walking toward
20 you? Where did he start from?
21 A  34th Street and Grand Central.
22 Q  So you are at 37th with Mr. Weigle?
23 A  Uh-huh (yes).
24 Q  Pifer is at 34th Street?

Page 33

1  A  Yes.
2  Q  Now, did he see you and you motioned for
3  him to come and you were walking toward each other?
4  A  Yes.
5  Q  You've got three blocks there?
6  A  Correct.
7  Q  You could see him from three blocks
8  away?
9  A  Yes.
10 Q  Did you radio him or you just kept
11 walking toward him?
12 A  I am not sure if I radioed or just
13 walked and just said hey.
14 Q  So about where did you guys meet up? If
15 he starts at 34th and you are at 37th, about where did you
16 meet up?
17 A  36th maybe.
18 Q  Somewhere in the middle?
19 A  Somewhere in the middle.
20 Q  So then what happened? Did you tell him
21 Mr. Weigle wouldn't stop honking? Could you still hear
22 the horn being honked at this time?
23 A  No, it wasn't being honked.
24 Q  He says you go direct traffic, I will

Shelia Miller, Certified Court Reporter
(304) 757-6455

Deposition of Joshua Allen Cole
Weigle v. Pifer, et al.
Case No. 2:14-cv-15087

**Sheet 10 Page 34**

1 take care of this, more or less. Then what happens?
2  A  Then I went to direct traffic.
3 Eventually, I had my back to the southbound lanes, so I
4 was directing traffic. Occasionally I would look over to
5 see what was going on, and he did pull over shortly after
6 Sergeant Pifer was over there.
7  Q  Did you see what happened after that,
8 after he pulled over?
9  A  At one point, they were -- Mr. Weigle
10 had stepped out of the car, and they were speaking to each
11 other on the sidewalk or the parking lane.
12  I am not exactly sure where they were
13 standing at the time, but it was off the traveling lane.
14 Then at one point, I see Mr. Weigle is on, I am not sure
15 if it was a cruiser or his car, on the hood of a vehicle,
16 and Sergeant Pifer, I believe, had his wrists, and it
17 looked like he was attempting to arrest him.
18  Q  Did they appear to be arguing?
19  A  Before the arrest?
20  Q  Uh-huh (yes).
21  A  It appeared to be a heated conversation.
22  Q  What makes you say that?
23  A  Mr. Weigle's mannerisms, his hands up in
24 the air talking. He was talking with his hands as if he

**Page 35**

1 was frustrated.
2  Q  Could you hear any shouting or yelling
3 or anything?
4  A  I don't think so.
5  Q  Then what happened that you observed?
6  A  It looked like Sergeant Pifer was
7 attempting to arrest Mr. Weigle. Mr. Weigle had his hands
8 clasped in front of him.
9  Q  When you were there, you never attempted
10 to arrest him, did you?
11  A  No, I did not.
12  Q  You believe that you could have arrested
13 him for the noise violation and/or --
14  A  Refusing to pull over when asked.
15  Q  Are both of those crimes, to your
16 knowledge?
17  A  When you are being detained for a crime
18 and you are in a vehicle, when an officer asks you to pull
19 over, you have to pull over.
20  Q  Now, at any time, did you see, is it
21 Officer or Sergeant Ingraham? Is he a Sergeant?
22  A  Sergeant.
23  Q  Join Sergeant Pifer and Mr. Weigle?
24  A  I believe he was over there at the time,

**Page 36**

1 but like I said, I was conducting traffic, so I am looking
2 over my shoulder as this is occurring, and they didn't
3 appear to need any of my assistance.
4  Q  At any time, did you ever see either
5 officer strike Mr. Weigle?
6  A  I don't recall them striking him.
7  Q  You don't recall it or you didn't see
8 it?
9  A  I didn't see them strike him.
10  Q  Did you ever see him strike, Mr. Weigle
11 strike any of the officers?
12  A  No, I did not see that.
13  Q  So you didn't see anybody strike
14 anybody?
15  A  That is correct.
16  Q  At any time, did you see Mr. Weigle bent
17 over the hood of a car?
18  A  Yes.
19  Q  Which car was it?
20  A  I believe it was a police cruiser.
21  Q  Can you tell me what was happening when
22 you saw that?
23  A  I believe Sergeant Pifer had control of
24 at least one wrist, and it appeared that Mr. Weigle was

**Page 37**

1 clasping his hands in front of him.
2  Q  Can you demonstrate what you are talking
3 about when you say --
4  A  Just some sort of -- he was grabbing one
5 hand with the other hand, like his hands appeared to be
6 locked in front of him.
7  Q  Is this while he was bent over the hood
8 or was this before?
9  A  This was while he was like on the hood.
10  Q  Did it appear that Mr. Weigle was
11 protecting his abdomen?
12  A  No, when I saw it, that is not what I
13 thought was going on. It just appeared that he was
14 attempting not to be handcuffed.
15  Q  But in retrospect, when you look back on
16 it, could it have been that Mr. Weigle was attempting to
17 protect his abdomen?
18  MR. HILL: I will object to the extent it calls
19 for speculation. You can answer.
20  THE WITNESS: I have never seen anybody do that
21 before, and I have no reason to look at somebody clasping
22 their hands in front of them and think that they are
23 injured, so ...
24  BY MS. TAYLOR:

Shelia Miller, Certified Court Reporter
(304) 757-6455