UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

JAMES P. WEIGLE,

      Plaintiff,

v.                                    Civil Action No. 2:14-cv-15087

R.L. PIFER, individually and
in his capacity as an officer
with the City of Vienna Police Department, and
BRIAN INGRAHAM, individually and
in his capacity as an officer
with the City of Vienna Police Department, and
CITY OF VIENNA POLICE DEPARTMENT, a political
subdivision of the State of West Virginia, and
the CITY OF VIENNA, a political
subdivision in the State of West Virginia

      Defendants.

## MEMORANDUM OPINION AND ORDER

Pending is the defendants' motion for summary judgment, filed April 24, 2015.

## I.   Background

Plaintiff James P. Weigle ("Weigle") is a West Virginia citizen who lives in Parkersburg, West Virginia. The City of Vienna ("the City") is a municipality geographically adjacent to Parkersburg. The City, its police department, and Vienna police officers R.L. Pifer ("Pifer") and Brian Ingraham ("Ingraham")(collectively "the officers"), are each named

1

defendants in this action.[1]

This suit arises from an incident that occurred on April 21, 2012. That morning, at around 8 a.m., Weigle was driving southbound on Grand Central Avenue in Vienna. As he approached the intersection of Grand Central Avenue and 34th Street he became mired in traffic. Frustrated by the delay, Weigle sounded his car's horn.

The traffic delaying Weigle was the byproduct of a 5K footrace that was producing an intermittent stream of pedestrians on several of Vienna's thoroughfares, including 34th Street. To ensure the safety of these runners, members of both the Vienna Police Department and the Vienna Volunteer Fire Department were directing traffic at various locations along the course of the race. Pifer and Ingraham were two of the police

---

[1] The defendants argue that the Vienna police department is not a proper party because the department is "merely the vehicle through which the City government fulfills its policing functions" and "under West Virginia law, a police department is not a separate suable entity." Def. Mem. of Law in Supp. Mot. for Summ. J at * 25 (citing W. Va. Code § 8-14-1 and Tofi v. Napier, No. 2:10-CV-01121, 2011 WL 3862118, at * 4 (S.D.W. Va. Aug. 31, 2011)). Weigle concedes that the police department is not a proper party. See Pl. Resp. in Opp'n at * 16. Accordingly, the court concludes that the Vienna police department is not a proper party and should be dismissed. This dismissal does not affect the validity of Weigle's claims against the City, including those predicated on the actions of police officers or other employees of the police department.

officers engaged in traffic control for the race.

The parties agree generally on what happened next, though several important details are in dispute.  It is undisputed that at least one, and perhaps several, motorists near the intersection of Grand Central Avenue and 34th Street sounded their horn.  Weigle admits that he sounded his horn, but states that he did so only once, and only after he heard other drivers sound theirs.  The defendants claim that Weigle was sounding his car's horn "repeatedly."

Patrolman Joshua Cole ("Cole") who, along with Pifer, was directing traffic at the intersection of Grand Central Avenue and 34th Street, went to investigate the horn sounding. Walking along the line of stopped or slowly moving vehicles, Cole eventually determined that Weigle had sounded his horn.  He approached Weigle's small vehicle, a "Smart car," and instructed him to pull over to the side of the road.  Weigle did not comply.  Weigle claims that he did not comply because he did not recognize that Cole, who was wearing rain gear that obscured his police uniform and did not prominently display a badge, was a police officer.  Shortly thereafter, Cole returned to the intersection and spoke with Pifer.  After speaking with Cole, Pifer made his way to Weigle's vehicle.  Weigle concedes that he knew Pifer to be a policeman when he saw Pifer approaching.

When Pifer arrived, he knocked on Weigle's driver-side window, and Weigle rolled down his window in response.  After Weigle lowered the window, Pifer asked Weigle to produce his driver's license.  He also instructed Weigle to pull his vehicle out of the line of traffic and into the parking lane.  Weigle complied with the latter request and, after pulling into the parking lane, exited the vehicle.  Weigle produced his driver's license, although the parties disagree about the manner in which it was produced.  Weigle then began expressing his dissatisfaction with being stuck in traffic and Pifer offered commiserations.

The parties agree that shortly thereafter Weigle attempted to reenter his vehicle.  He was physically prevented from doing so by Pifer.  The parties disagree about the exact sequence of events that follow, but a physical altercation ensued.  During this altercation Pifer initiated an arrest of Weigle.

Sometime after Weigle had exited his vehicle, but before the arrest began, Ingraham, who had been directing traffic at a different intersection along the course of the race, arrived at the scene in his police cruiser.  Ingraham, in response to a signal from Pifer, had just begun to exit his cruiser when Pifer initiated the arrest.  Ingraham began

assisting Pifer in his attempts to secure Weigle.  Although the parties offer different accounts concerning the amount of force employed by the officers, it is undisputed that Pifer forcibly wedged Weigle against the hood of Ingraham's police cruiser during the arrest.  The officers were initially unable to handcuff Weigle, whose hands were positioned underneath his torso near his abdomen.  Eventually, with the assistance of Ingraham, who threatened to use pepper spray against Weigle, Pifer was able to secure handcuffs on Weigle and complete the arrest.

Weigle was processed, then eventually charged with obstructing a police officer.  He appeared before a county magistrate and was convicted.  He appealed that conviction, seeking de novo review in the Circuit Court of Wood County, West Virginia.  After a bench trial, the magistrate conviction was overturned and Weigle was acquitted.

Weigle initiated this action by filing a ten count complaint on April 21, 2014.  The first seven counts raise six state law claims against the officers (negligence, outrage, negligent infliction of emotional distress, assault, battery, and malicious prosecution) and one against the City (negligent retention).  The complaint's last three counts assert a number of federal constitutional claims arising under 42 U.S.C § 1983,

consisting of excessive force claims under the Fourth Amendment[2] against the officers related to their conduct during the arrest, and separate but related constitutional violations against the City, namely, that it had customs or policies that contributed to or caused the injuries inflicted by the officers during the arrest (the "Monell claims").

The defendants have moved for summary judgment on all counts.  The defendants advance a number of theories with respect to the state law claims, including insufficiency of the evidence, common law privilege, and statutory immunity.  With

---

[2] Wiegle's complaint alleges two separate excessive force claims against both Pifer and Ingraham.  Count Eight alleges a violation of the Fourth Amendment, while Count Nine alleges a violation of the Fourteenth Amendment.  Although both amendments can support an excessive force claim, they do so in different contexts.  Orem v. Rephann, 523 F.3d 442, 446 (4th Cir. 2008)(explaining that "[t]he Fourth Amendment [only] governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' . . . [w]hereas excessive force claims of a pretrial detainee [or arrestee] are governed by the Due Process Clause of the Fourteenth Amendment.")(internal quotation marks and citations omitted). In their briefing the defendants contend, and Weigle concedes, that Weigle's Fourteenth Amendment claim is inappropriate because the complaint does not allege that either officer used excessive force at any time other than during the arrest.  See Def. Mem. of Law in Supp. Mot. for Summ. J. at * 20 ("[Weigle's] only allegations of excessive use of force pertain to the actions of the officers during the arrest process."), Pl. Resp. in Opp'n at * 13 ("Plaintiff voluntarily withdraws his claim under the Fourteenth Amendment").  Accordingly, the defendants are entitled to judgment as a matter of law with respect to Count Nine's Fourteenth Amendment claim, and the court need not further address it.

respect to the federal claims, the defendants both invoke the protection of qualified immunity and argue that Weigle's claims are substantively meritless because the force used by officers during the arrest was objectively reasonable.

The court is properly invested with jurisdiction over the federal claims inasmuch as Section 1983 is a federal statute through which deprivation of constitutional rights may be redressed.  28 U.S.C. § 1331.  A district court properly invested with jurisdiction can also exercise supplemental jurisdiction over state law claims that "form part of the same case or controversy."  28 U.S.C. § 1367, see also United Mine Workers of Am. v. Gibbs, 383 U.S. 715 (1966).  Accordingly, the court has jurisdiction over all of Weigle's claims.

## II.   The Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the initial burden of showing — "that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248.

### III. Discussion

#### A.

With the exception of the malicious prosecution claim set forth in Count Seven and two of the four infliction of emotional distress claims in Counts Three and Four, each of

Weigle's claims relates either directly or indirectly to the force employed by the officers during his arrest.  The officers have asserted qualified immunity with respect to Weigle's Section 1983 claims and analogous state law statutory immunity with respect his state law claims.  "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability,'" Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)), immunity is a threshold issue which the court addresses before considering any of the defendants' proffered substantive bases for summary judgment.  Saucier v. Katz, 533 U.S. 194, 200 (2001)("Where [a] defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive."), Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)("We repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."); accord Robinson v. Pack, 223 W. Va. 828, 831 (2009)("'We agree with the United States Supreme Court to the extent it has encouraged, if not mandated, that claims of immunities, where ripe for disposition, should be summarily decided before trial.'")(quoting Hutchison v. City of Huntington, 198 W.Va. 139 (1996)).

9

1. <u>Qualified Immunity of Officers Pifer and Ingraham with</u>
<u>Respect to the Section 1983 Claims</u>

"The doctrine of qualified immunity protects
government officials 'from liability for civil damages insofar
as their conduct does not violate clearly established statutory
or constitutional rights of which a reasonable person would have
known.'" <u>Pearson</u>, 555 U.S. at 231 (2009)(quoting <u>Harlow v.
Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  It is clearly
established that the Fourth Amendment confers upon individuals a
constitutional right to be free from excessive force during the
course of an arrest.  <u>Graham v. Connor</u>, 490 U.S. 386 (1989),
<u>accord</u> <u>Turmon v. Jordan</u>, 405 F.3d 202, 207 (4th Cir. 2005)("The
Fourth Amendment's right to be free from unreasonable seizures
includes the right to be free from seizures carried out with
excessive force.").  Thus, whether or not qualified immunity
shields Pifer and/or Ingraham from Section 1983 liability
depends upon whether or not the force employed during Weigle's
arrest was excessive.

"Determining whether the force used to effect a
particular seizure is reasonable under the Fourth Amendment
requires a careful balancing of the nature and quality of the
intrusion on the individual's Fourth Amendment interests against
the countervailing governmental interests at stake." <u>Graham</u>,
490 U.S. at 396 (internal citations and quotation marks

10

omitted).  This inquiry into reasonableness is an objective one.[3]
"[T]he question is whether the officers' actions are
'objectively reasonable' in light of the facts and circumstances
confronting them, without regard to their underlying intent or
motivation."  Id. at 397.

   Although the test for reasonableness of the force used
during an arrest is an objective one, our Court of Appeals has
explained that the exact contours of the inquiry are "not
capable of precise definition or mechanical application."
Bailey v. Kennedy, 349 F.3d 731, 743 (4th Cir. 2003).  In
general, "[t]he nature of the intrusion on a plaintiff's Fourth
Amendment rights is generally measured by the amount of force
employed to affect [sic] the seizure. The extent of the
plaintiff's injuries is also a relevant consideration."  Turmon,
405 F.3d 202, 207 (4th Cir. 2005)(internal citations omitted).
That intrusion is weighed against several factors representing
the governmental interests at stake, including the "'severity of
the crime at issue, whether the suspect pose[d] an immediate

---

[3] Last term, in City and County of San Francisco, Calif. V.
Sheehan, the Supreme Court clarified that Graham cannot be
applied at an overly broad level to make officers liable for all
"unreasonable searches and seizures."  135 S.Ct. 1765, 1776
(2015).  But the Court has also made clear that Graham continues
to supply the framework of analysis in excessive force cases.
See id. at 1775-76 (stating that Graham "holds . . . that the
objective reasonableness test applies to excessive-force claims
under the Fourth Amendment")(internal quotations omitted); see
also Kingsley v. Hendrickson, 135 S.Ct. 2466 (2015).

threat to the safety of the officer or others, and whether [he]

. . . actively resist[ed] arrest or attempt[ed] to evade arrest

by flight.'" Bailey, 349 F.3d at 743 (quoting Graham, 490 U.S.

at 396). Balancing these "Graham factors" against the amount of

force exerted by the arresting officers "requires careful

attention to the facts and circumstances of each particular

case." Id. Moreover, in Graham, the Supreme Court explained

that:

> The reasonableness of a particular use of force must be
> judged from the perspective of a reasonable officer on
> the scene, rather than with the 20/20 vision of
> hindsight. . . . Not every push or shove, even if it may
> later seem unnecessary in the peace of a judge's
> chambers, violates the Fourth Amendment. The calculus of
> reasonableness must embody allowance for the fact that
> police officers are often forced to make split-second
> judgments — in circumstances that are tense, uncertain,
> and rapidly evolving — about the amount of force that is
> necessary in a particular situation.

Graham, 490 U.S. at 396-97 (internal citations and quotation

marks omitted).

        As outlined above, the parties agree, at least in

broad strokes, about the events that occurred immediately before

and then during Weigle's arrest. It is undisputed that Weigle

was stuck in traffic, sounded his horn at least once, took his

car out of the flow of traffic at Pifer's request, exited the

vehicle in order to display his driver's license, and was

forcibly arrested after trying to reenter his vehicle. However,

the parties offer materially different accounts concerning various details which provide the necessary context for determining if the force employed by the officers was reasonable or excessive.

Pifer states that Weigle exited his vehicle without being asked to do so.  Pifer Dep.[4] at 61.  Weigle contends that he exited the vehicle because Pifer asked him to produce his driver's license and he could not retrieve the license from his wallet (which was in his pants pocket) without exiting the vehicle, and that he informed Pifer of this.  Weigle Dep.[5] at 28, see also Cir. Ct. Tr.[6] at 95, 107 (testimony of Charles Noffsinger corroborating Weigle's explanation for exiting the vehicle).  The parties agree that Weigle then produced his license, but disagree on the manner of its production.  Pifer claims Weigle "aggressive[ly] placed his driver's license under Sgt. Pifer's nose."  Def. Mem. of Law in Supp. Mot. for Summ. J.

---

[4]Excerpts of Pifer's deposition are attached as "Exhibit 1" to the defendants' motion for summary judgment. (ECF 36-1(a) and 36-1(b)).  The entirety of Pifer's deposition is attached as "Exhibit A" to Weigle's response in opposition. (ECF 46-1).
[5] Excerpts of Weigle's deposition are attached as "Exhibit 5" to the defendants' motion for summary judgment. (ECF 36-6).  The entirety of Weigle's deposition is attached as "Exhibit C" to Weigle's response in opposition. (ECF 46-3).
[6] Excerpts of the transcript of Weigle's non-jury criminal trial in the Circuit Court of Wood County, West Virginia are attached as "Exhibit 2" to the defendants' motion for summary judgment. (ECF 36-3).  The entirety of the trial transcript is attached as "Exhibit B" to Weigle's response in opposition. (ECF 46-2).

at * 3 (citing Pifer Dep. at 61).  Weigle contends he merely
handed his license to Pifer.  Weigle Dep. at 33, <u>see</u> <u>also</u> Cir.
Ct. Tr. at 110 (testimony of Charles Noffsinger that he did not
see Weigle shove the license under Pifer's nose, and did not see
any other behavior that would constitute assault).  The parties
agree that immediately after the license was produced, Pifer and
Weigle engaged in conversation.  While both acknowledge that
they discussed the reason underlying Weigle's decision to sound
his horn as well as his general frustration with being stuck in
traffic, they disagree about what was said immediately before
the sequence of events that precipitated the arrest.

        Pifer provides the following version of events.  After
Weigle presented his driver's license to Pifer, Weigle began
expressing his dissatisfaction with being stuck in traffic.
Pifer Dep. at 64-65.  Pifer engaged Weigle in conversation in an
attempt to "disarm him emotionally."  <u>Id.</u> at 66.  Weigle
remained agitated and eventually told Pifer that, "[t]his is all
bull---t, and I'm f----ng leaving."  <u>Id.</u> at 68.  Pifer,
concerned that Weigle might do something reckless, "slammed the
door of [Weigle]'s car and said 'No, you're not leaving.'"  <u>Id.</u>
at 68-69, <u>see</u> <u>also</u> Cir. Ct. Tr. at 140 (testimony of Kerry
Miller describing Weigle "aggressively" opening the car door,
and then Pifer "slamm[ing] the door" shut).  Concerned that

Weigle was "not calming down," Pifer then signaled to Ingraham, who was in his police cruiser in the line of traffic a few cars behind where Weigle had been, to pull into the parking lane. Pifer Dep. at 70.

As Ingraham was pulling into the parking lane, Weigle said either "F--k this. I'm leaving" or "F--k you. I'm leaving" and tried to reenter his vehicle. Id. at 73. As Weigle moved toward the driver's side door, he struck Pifer with his shoulder. Id. at 73-74 (Pifer testifying that "[Weigle] had – for lack of a better term, he had muscled past me . . . [y]ou know, struck me with his left shoulder."), see also Cir. Ct. Tr. at 37 (testimony of Pifer: "I closed the door of his car and said, 'No. . . [y]ou're not free to leave.'  And then he kind of tried to bull past me").  Pifer then "grabbed [Weigle's] left elbow . . . and grabbed [Weigle's] right shoulder . . . and walked him back towards Sergeant Ingraham's car and placed him across the hood to be arrested." Pifer Dep. at 73.  He also told Weigle, "That's it.  You're under arrest."  Id. at 76.

Although Pifer grabbed Weigle by the elbow and shoulder as he placed him on the hood of Ingraham's police cruiser, Weigle's hands were not secured and became lodged underneath his abdomen, near his stomach. Id. at 75.  Weigle began "actively trying to stand upright and come off the hood,"

Id. at 77, so Pifer, who is six foot four inches tall and weighs over 300 pounds, id. at 124, leaned against Weigle to "forc[e] him to remain on the hood." Id. at 76.  Pifer placed his right hand on Weigle's "upper back" in order to "apply the maximum amount of equal pressure against his back so that [Weigle] could not raise up off the car." Id. at 80.  At this point Ingraham became involved in the arrest by attempting to take "control . . . [of] Weigle's right arm." Id.  Pifer then verbally directed Weigle to "remove his hands out from under himself" so he could be handcuffed. Id. at 77, 82-83.  When Weigle did not comply with that request, Ingraham "announced" that he was going to pepper spray Weigle. Id. at 83.

Pifer then told Weigle to "[p]ut your hands behind your back and you won't be sprayed" but Weigle did not comply. Id. at 85.  Instead, he "immediately jerked his head to the left[,] away from the pepper spray canister." Id. at 84.  Pifer responded by placing his forearm underneath of Weigle's nose and "used it as a pressure point to move [Weigle's] head . . . so that [Weigle] was looking directly at [the pepper spray canister]." Id. at 85.  At that point, Weigle said "Okay" and released his hands from underneath his body, allowing Pifer and Ingraham to place his hands behind his back and handcuff him. Id. at 87, see also Cir. Ct. Tr. at 38 (testimony of Pifer:

16

"When I placed him on the hood of Officer Ingraham's car, Mr. Weigle refused to place his hands behind his back. I stated he was being arrested . . . [and said] 'Place your hands behind your back,' and he refused. I believe he clasped his hands underneath of his stomach laying against there, and then we had to, frankly, force him to raise his head. And Sergeant Ingraham stated he was going to pepper spray him, and that's when we got his hands out. He released his hands, and we placed him under arrest.").  Pifer denies using a taser on Weigle during the arrest, and states that neither he nor Ingraham were carrying a taser on the day of the incident.  Pifer Dep. at 107-108. Ingraham's account of the incident generally corroborates the account given by Pifer.  See Ingraham Dep.[7] at 43-49, see also Cir. Ct. Tr. at 76-77.

Weigle offers a different account of the events both leading up to and during his arrest.  According to Weigle, after knocking on the car window, Pifer asked to see his driver's license.  See Cir. Ct. Tr. at 218.  Only after Weigle exited the vehicle and handed Pifer his driver's license did Pifer ask to see Weigle's vehicle registration and insurance card.  Weigle

---

[7] Excerpts of Ingraham's deposition are attached as "Exhibit 6" to the defendants' motion for summary judgment. (ECF 36-7).  The entirety of Ingraham's deposition is attached as "Exhibit F" to Weigle's response in opposition. (ECF 46-6).

Dep. at 33, Cir. Ct. Tr. at 281.[8]  Because those documents were in the glove box of his car, Weigle opened the driver's side door so he could reenter the vehicle in order to obtain them. Weigle Dep. at 33.  As soon as he opened the door, Pifer "slam[med] the [car] door shut."  Id.  Weigle looked at Pifer and said, "[S]ir, the registration card and insurance card is in the glove box.  You're going to have to let me in the car if you want to see them."  Id.  In response, Pifer made a motion, apparently to Ingraham, and then told Weigle "get in that cruiser."  Id.  Weigle inquired if he was under arrest, and Pifer either didn't give a response, or Weigle, who suffers from hearing loss, didn't hear it.  Id.  Weigle then "turned to go get in the cruiser," Cir. Ct. Tr. at 206, and it is at that point that Pifer "pile drive[d]" him "right over the hood of [Ingraham's] car."  Weigle Dep. at 34.  Pifer "mashed his weight

---

[8] It is worth noting that Pifer admitted, during his deposition, that he asked Weigle to produce his registration and insurance card at this point in the encounter:

> Question: Did you ask him again at some point — for verification of insurance? . . .
> Answer: I believe I did ask him again for his registration and insurance card.
> Question: Do you remember at what point in your interaction you would have asked for it again?
> Answer: It was during the time when we were beginning to verbally spar whenever he was being very aggressive and hostile in action and verbage [sic].

Pifer Dep. at 78-79.

down" on Weigle, causing him "severe pain." Id.  Weigle claims

he "rotated" and said, "don't mash me like that . . . I had

stomach surgery." See Cir. Ct. Tr. at 206, Weigle Dep. at 34.

Pifer responded with a "forearm [to Weigle's] neck" and began

"mashing the living hell out of" Weigle, causing him

"excruciating pain." Weigle Dep. at 34.  Then another

policeman, presumably Ingraham, began trying to "rip [Weigle's

right arm] over [his] shoulder" in such a manner that it felt

like the arm was being "pull[ed] out of [its] joint." Id.

Weigle explains that had he known he was under arrest

he "would have complied" and that Pifer's use of force was a

"big surprise." Id. at 41.  He also states that the specific

way the officers attempted to subdue him was the cause of his

failure to comply with the requests to put his hands behind his

back.  Weigle Dep. at 40 (testimony of Weigle that the officers

placed handcuffs on him "[a]s soon as [Pifer] let up on my neck

so I could pick my shoulder up to — you can't rotate your arm if

you're mashed.  You can't get your shoulder up to rotate your

arm.  So as soon as he let up on my neck — I twisted up like

this to put my hand behind my back."); Cir. Ct. Tr. at 208-09

(testimony of Weigle: "I was laying flat on the hood, and my

shoulders was [sic] smashed.  And I'll want to watch anybody

rotates [sic] their arm behind you when you can't raise your

shoulder to twist your arm to put it behind you."). Weigle also claims that the officers used a taser on him at some point during the encounter. Weigle Dep. at 60, 126, see also Cir. Ct. Tr. at 209.

The differences in these two accounts are material. The actions of the officers, and those of Pifer in particular, can be cast in a wildly different light. If Pifer acted out of concern for his own safety, or the safety of others, his decision to use force may be constitutionally reasonable. See Morrison v. Bd. Of Trustees Of Green Twp., 583 F.3d 394, 405 (6th Cir. 2009)("[A] police officer's use of force against a suspect is justified by the threat posed by the suspect to the safety of the officer or others.")(citation omitted), Weigel v. Broad, 544 F.3d 1143, 1152 (10th Cir. 2008)("Where [an] officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape [through the use of] force.")(citation omitted).

In his deposition, Pifer states that he initiated the arrest because he was worried that if Weigle drove off he would endanger others in the area, most notably the participants in the footrace. Pifer Dep. at 68-69. Officer safety is also a paramount consideration during traffic stops, given the ease

20

with which weapons can be concealed within an automobile and the ready access drivers and passengers have to such weapons.  <u>See</u> <u>Michigan v. Long</u>, 463 U.S. 1032, 1047-48 (1983)(recognizing that "investigative [situations] involving suspects in vehicles are especially fraught with danger to police officers" as well as noting that "suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves [appear to] be armed"), <u>see</u> <u>also</u> <u>Pennsylvania v.</u> <u>Mimms</u>, 434 U.S. 106 (1977)(per curiam)(holding that officer safety was a sufficient justification for police officers' standard practice of ordering drivers to exit their vehicle during traffic stops).  During his deposition, Pifer testified that he was cognizant of the danger associated with allowing a suspect to reenter a vehicle during a traffic stop.  Pifer Dep. at 148-149.  The risk was not hypothetical in this case, given that Weigle had a loaded .380 caliber pistol in his car "next to the driver's seat," Weigle Dep. at 44-45, although there is no indication that the officers were aware of it at the time.

In contrast, if Pifer initiated the arrest in response to Weigle's brusque demeanor and use of profanity, his use of force may be deemed unconstitutional.  <u>Cf</u> <u>United States v. Cobb</u>, 905 F.2d 784, 789 (4th Cir. 1990)("[W]e do not agree with [the government] that mere words . . . can justify the use of

physical force by a police officer."). Similarly, a jury could conclude that Pifer's proffered concerns about the safety of himself or others are not credible given that he had asked Weigle to produce his registration and insurance card, implicitly inviting Weigle to reenter the vehicle in order to obtain items that are customarily kept inside a vehicle's glove compartment.

Moreover, Pifer and Ingraham's account of the arrest repeatedly emphasizes that Weigle refused to put his hands behind his back and submit to being handcuffed. If Weigle was resisting arrest — that is, if he was intentionally refusing to allow his hands to be cuffed behind his back — his failure to comply is taken into account when evaluating the reasonableness of the force used. See Graham, 490 U.S. at 396. However, if the manner in which the officers were applying force caused Weigle's inability to comply, and that, in turn, prolonged the period for which he was subjected to such force, a jury could reasonably determine that Weigle was not resisting, and if such a finding were made, the force employed by the officers against a non-resisting suspect would likely qualify as excessive. See e.g., Bennett v. Krakowski, 671 F.3d 553, 562 (6th Cir. 2011)(noting that "no force" is necessary to restrain a suspect who is not resisting arrest). Additionally, if the jury

determines that Ingraham used a taser against Weigle after he
stopped resisting, that use of force could be considered
excessive.  See Meyers v. Baltimore County, Md., 713 F.3d 723
(4th Cir. 2013)(officer's use of a taser against an arrestee no
longer actively resisting violated arrestee's clearly
established constitutional rights).

The injuries Weigle suffered during the arrest are
also relevant to the reasonableness inquiry, and they too are in
dispute.  Weigle claims to suffer from a variety of injuries
that were caused or exacerbated by the arrest, including
abdominal tenderness, a cervical strain, a low back strain,
damage to his right shoulder, damage to his esophagus and
bowels, and numerous complications related to his 1996 Nissen
fundoplication surgery.[9]  See Pl. Compl ¶ 25-27; Weigle Dep. at
125; Cir. Ct. Tr. at 207-11.  He also claims to have had a taser
used on him during the arrest, causing him to lose control of
his bowels.  See Weigle Dep. at 61.  In contrast, Pifer states
that after taking Weigle to the police station for processing he
asked Weigle "a couple times" if he was injured or if he wanted
medical personnel to take a look at him and that "every time

---

[9] As described by Weigle, a Nissen Fundoplication is a surgical
procedure, intended to combat severe acid reflux disease, which
involves wrapping a portion of an individual's stomach around
the bottom of their esophagus.  See Weigle Dep. at 108-13.

[Weigle] told me no."  Pifer Dep. at 96.  And, as noted above, Pifer categorically denies that a taser was used on Weigle during the arrest.

The preceding paragraphs outline the parties' disagreements concerning the facts.  These disagreements are material.  These material disagreements preclude the application of qualified immunity to the officers at this juncture.  The right to be free from excessive force during an arrest is a clearly established constitutional right.  Our Court of Appeals has explained that, in circumstances where qualified immunity is invoked, if there is a "genuine question of material fact regarding '[w]hether the conduct allegedly violative of [such a clearly established] right actually occurred,'" the necessary fact-finding "must be reserved for trial."  Willingham v. Crooke, 412 F.3d 553, 559 (4th Cir. 2005)(citations omitted). Accordingly, neither Pifer nor Ingraham is entitled to summary judgment on the issue of qualified immunity.[10]

_____

[10] Defendants' reply brief refers to, and is accompanied by, an opinion from an expert, Samuel Faulkner.  See Def. Repl. to Pl. Resp. to Mot. for Summ. J. and Suppl. Br. in Supp. of Mot. for Summ. J. at * 13.  The opinion from the expert is largely a conclusion about the appropriate use of force.  It does nothing to bridge the difference between the plaintiff's and the defendants' account of the incident in question.  Moreover, the defendants acknowledge that their new evidence and arguments, including the conclusions of Samuel Faulkner, constitute a "Supplemental Brief in Support of [the] Motion for Summary

2.  <u>Qualified Immunity of Officers Pifer and Ingraham with respect to Weigle's state law claims.</u>

Pifer and Ingraham invoke the statutory immunity provided by West Virginia's Governmental Tort Claims and Insurance Reform Act, W. Va. Code § 29-12A-5, against Weigle's state law negligence, outrage, negligent infliction of emotional distress, assault, and battery claims.  The statute, which provides qualified immunity to employees of political subdivisions, provides in pertinent part:

> (b) An employee of a political subdivision is immune from liability unless one of the following applies:
>
> (1)  His or her acts or omissions were manifestly outside the scope of employment or official responsibilities;
> (2)  His or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or
> (3)  Liability is expressly imposed upon the employee by a provision of this code.

W. Va. Code § 29-12A-5(b).

As the West Virginia Supreme Court of Appeals noted in <u>City of Saint Albans v. Botkins</u>, 228 W. Va. 393, 398 (2011),

---

Judgment."  <u>See</u> Def. Repl. to Pl. Resp. to Mot. for Summ. J. and Suppl. Br. in Supp. of Mot. for Summ. J. at * 1.  The court need not consider new evidence or arguments raised in a reply, since the other party has had no opportunity to rebut them.  <u>Cf.</u> <u>Hunt v. Nuth</u>, 57 F.3d 1327, 1338 (4th Cir. 1995)(noting that the "appellate courts generally will not address new arguments raised in a reply brief because it would be unfair to the appellee and would risk an improvident or ill-advised opinion on the legal issues raised").

"[West Virginia's] approach to matters concerning immunity historically has followed federal law."  Consequently, much of the same analysis applicable to Pifer and Ingraham's invocation of qualified immunity against Weigle's Section 1983 claims applies with equal force to their invocation of statutory immunity against the state law claims.

Weigle's state law claims are, with three exceptions,[11] predicated on the same facts as his Section 1983 claims.  Those facts, as discussed above, are in dispute.  Although it is clear that a police officer engaged in an arrest is acting within the scope of his employment, determining whether or not an officer's conduct during such an arrest was undertaken with malicious purpose, in bad faith, or in a wanton or reckless manner necessarily depends upon the nature of the officer's conduct and the context in which it occured.  When the parties have, as here, a genuine disagreement about the material underlying facts necessary to engage in this inquiry, summary judgment is

---

[11] The most notable of the three exceptions is the malicious prosecution claim set forth in Count Seven, which is entirely predicated on Pifer's involvement in the pursuit of criminal charges against Weigle.  The other two exceptions are set forth in Counts Three and Four, which contain Weigle's claims for outrage and negligent infliction of emotional distress.  Each of those two counts sets forth two claims: one based on the conduct of Pifer and Ingraham during the arrest, and the other based on a subsequent incident in which Pifer is alleged to have followed Weigle to his home and verbally harassed him.  See part III section B.2 and B.4, infra.

inappropriate.  See Syl. pt. 1, Hutchison v. City of Huntington, 198 W. Va. 139 (1996)("The ultimate determination of whether qualified or statutory immunity bars a civil action is one of law for the court to determine. Therefore, unless there is a bona fide dispute as to the foundational or historical facts that underlie the immunity determination, the ultimate questions of statutory or qualified immunity are ripe for summary disposition.").  As set forth at length in part III section A.1 above, a bona fide dispute exists as to whether the conduct of either officer was undertaken maliciously or in bad faith or wantonly or recklessly.  Accordingly, Pifer and Ingraham are not entitled to summary judgment with respect to Weigle's state law claims on the basis of statutory immunity.

B.

Having determined that the officers are not entitled to summary judgment on the basis of their invocation of qualified immunity, the court turns to defendants' substantive arguments for summary judgment.

1.  Assault and Battery

West Virginia permits a plaintiff who has asserted a Section 1983 claim against a law enforcement officer to pursue

27

an independent claim for assault, battery or other common law intentional tort even if those claims arise from the same facts as the Section 1983 claim.  Neiswonger v. Hennessey, 215 W. Va. 749, 753 (2004)(holding that collateral estoppel did not bar plaintiff from asserting state law claims, including assault, battery, and intentional infliction of emotional distress, against a police officer despite federal district court's ruling, in a case arising from the same incident, that there was no viable Section 1983 excessive force claim because the defendant police officer's use of force was objectively reasonable).

In West Virginia, assault and battery are separate torts.  As the West Virginia Supreme Court of Appeals explained in West Virginia Fire & Casualty Co. v. Stanley:

> An actor is subject to liability to another for assault if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension.
>
> * * *
>
> An actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.

West Virginia Fire & Casualty Co. v. Stanley, 216 W. Va. 40, 51,

28

52 (2004)(quoting the Restatement (Second) of Torts (1965)), see also State v. Cunningham, 160 W. Va. 582, 593 (1977)(Miller, J., dissenting) ("An assault is, of course, the threat to do violence as distinguished from the actual doing of violence, which is a battery.").

Counts Five and Six of Weigle's complaint set forth common law assault and battery claims against the officers.  Pl. Compl. ¶ 62-63, 67-68.  The facts, as discussed above, render Weigle's assault claim superfluous.  The officers did not merely threaten offensive contact with Weigle — they forcibly arrested him.  Although there may be instances where a completed assault leads immediately to completed battery and two separately viable claims remain, this case is not one of them.  Here, Weigle's assault claim is entirely subsumed by his claim for battery.

The officers argue that, their lack of immunity notwithstanding, they cannot be held liable for a battery because they were privileged to use force to complete the arrest.  See Def. Mem. of Law in Supp. Mot. for Summ. J at * 13 (citing Hutchinson v. W. Virginia State Police, 731 F. Supp. 2d 521, 547 (S.D.W. Va. 2010)("An activity that would otherwise subject a person to liability in tort for assault and battery, however, does not constitute tortious conduct if the actor is privileged to engage in such conduct.") aff'd sub nom.

<u>Hutchinson v. Lemmon</u>, 436 F. App'x 210 (4th Cir. 2011).

Although there is no West Virginia case which directly acknowledges a law enforcement privilege for battery in the course of an arrest, it is evident from <u>Stanley</u> that West Virginia adheres to the definition of battery set forth in the Restatement (Second) of Torts. Section 118 of the Restatement announces the "general principle" that an individual engaged in an arrest is afforded a privilege that precludes a battery claim. <u>See</u> Restatement (Second) of Torts at § 118. When that section is read in concert with § 121, which provides law enforcement officers a privilege to engage in arrests within the limit of their jurisdiction, there is no question that the Restatement definition embraced by <u>Stanley</u> contains a law enforcement privilege to use force during the course of an arrest. <u>See</u> <u>Lee v. City of S. Charleston</u>, 668 F. Supp. 2d 763, 779 (S.D.W. Va. 2009)("[A] peace officer acting within the limits of his appointment is privileged to arrest another"),

That privilege is not absolute. The Restatement articulates several provisions that limit or abrogate the privilege. Notably, the Restatement explicitly states that force that would otherwise constitute a battery is not privileged if that force is excessive. Restatement (Second) at § 132 ("The use of force against another for the purpose of

30

effecting the arrest . . . is not privileged if the means employed are in excess of those which the actor reasonably believes to be necessary."); accord <u>Gray v. Board of County Commissioners of Frederick County</u>, 551 F. App'x 666, 677 (4th Cir. 2014)("[law enforcement] officers are privileged to commit a battery pursuant to a lawful arrest, subject to the excessive force limitation.")(citation omitted).

As discussed with respect to the officer's immunity claims, the reasonableness of the force used during Weigle's arrest cannot be properly evaluated on this motion because of the material disputes of fact concerning both the specific amount of force applied and the context surrounding its application.  Thus, the propriety of the officers' invocation of privilege is dependent upon the resolution of the disputed factual questions.

Accordingly, while summary judgment in favor of the officers on the assault count is appropriate, summary judgment on the battery count is not.

2.   <u>Outrage</u>[12]

---

[12] "Intentional or reckless infliction of emotional distress [is] also called the 'tort of outrage.'"  <u>Travis v. Alcon Labs., Inc.</u>, 202 W. Va. 369, 374 (1998).

West Virginia recognizes outrage as a viable cause of action. Syl. pt. 6, <u>Harless v. First Nat. Bank in Fairmont</u>, 169 W.Va. 673 (1982). In <u>Travis v. Alcon Laboratories, Inc.</u>, the West Virginia Supreme Court of Appeals set forth a four-part test by which outrage is proven:

> [I]n order for a plaintiff to prevail on a claim for intentional or reckless infliction of emotional distress, four elements must be established. [The four elements are]: (1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

<u>Travis v. Alcon Laboratories</u>, 202 W. Va. 369, 375 (1998). To qualify as legally outrageous, a defendant's conduct must be "'more than unreasonable, unkind or unfair; it must truly offend community notions of acceptable conduct.'" <u>Id.</u> (internal citation omitted). "Liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." <u>Tanner v. Rite Aid of West Virginia</u>, 194 W.Va. 643, 651 (1995) (citing the Restatement (Second) of Torts § 46(1) (1965)). The Restatement definition used in <u>Tanner</u> goes on to explain that for behavior to be actionable it must be "so extreme in degree[] as to go beyond all possible bounds of

decency[] and [thus] be regarded as atrocious, and utterly
intolerable in a civilized community." Id.  The initial
decision as to whether complained-of conduct qualifies as
legally outrageous is a question of law to be decided by the
trial court.  Hatfield v. Health Mgmt. Associates of W.
Virginia, 223 W. Va. 259, 268 (2008)(explaining that a court
evaluating the viability of an outrage claim must "first
determine whether the defendant's conduct may reasonably be
regarded as so extreme and outrageous as to constitute the
intentional or reckless infliction of emotional distress.
Whether conduct may reasonably be considered outrageous is a
legal question, and whether conduct is in fact outrageous is a
question for jury determination.").

        Count Three of Weigle's complaint sets forth two
claims for outrage.  The first is predicated on the actions
undertaken by both officers during the arrest.  See Pl. Compl. ¶
50.  The second involves an incident involving Pifer and Weigle
that occurred about two months after Weigle's arrest, in which
Weigle alleges that Pifer followed Weigle to his home and
verbally harassed him.  See id. at 28-29, 51.

        The defendants argue that they are entitled to summary
judgment with respect to these outrage claims because the
"conduct of the officers falls well short of the high standard

33

of proof" required to succeed on an outrage claim. Def. Mem. of Law in Supp. Mot. for Summ. J. at * 11. They are plainly correct with respect to Weigle's second outrage claim, the one predicated on Pifer's alleged verbal harassment of Weigle near his home. During that encounter, Weigle claims Pifer followed him home, unnecessarily initiated a traffic stop, and then verbally threatened him, all because Pifer believed Weigle had driven by his home. See Weigle Dep. at 54-56. Pifer admits that, during the incident, he told Weigle, "Don't you ever come back around me or my kids." Pifer Dep. at 117. The incident did not result in criminal charges against Weigle, and no formal complaint was lodged against Pifer.

Pifer's conduct during the incident, at worst, involved minor abuse of his law enforcement authority and the issuance of a thinly veiled threat against Weigle. While far from laudable, such behavior does not satisfy the high standard necessary to sustain a claim of outrage. As the Supreme Court of Appeals explicitly stated in Tanner, an outrage claim cannot be predicated on "threats . . . [or] petty oppressions." Accordingly, Pifer is entitled to summary judgment with respect to Weigle's second outrage claim.

Weigle's first outrage claim, the one predicated on the conduct of the officers leading up to and during his arrest,

is a closer question.  Courts applying West Virginia law have,
on several occasions, considered outrage claims against law
enforcement officers predicated on their conduct during an
arrest or other seizure.  Most have determined that the actions
of the law enforcement officer, even if otherwise actionable,
did not qualify as legally outrageous.  See e.g., Woods v. Town
of Danville, W.V., 712 F. Supp. 2d 502 (S.D.W. Va.
2010)(mistaken arrest of wrong suspect, during which police
officer lifted the arrestee off the ground by the chain of his
handcuffs, was held to be not outrageous); Lee v. City of S.
Charleston, 668 F. Supp. 2d 763 (S.D.W. Va. 2009) (public strip
search which exposed arrestee's genitals, but only to the
arresting officer, was not legally outrageous), Lowe v. Spears,
No. CIV.A. 3:06-0647, 2009 WL 1393860, at * 6 (S.D.W. Va. May
15, 2009)(officer's decision to arrest individual for a minor
offense, possibly in response to arrestee's use of profanity
toward the officer, was not legally outrageous); cf. Hutchinson
v. W. Virginia State Police, 731 F. Supp. 2d 521, 531 (S.D.W.
Va. 2010)(female suspect who was forcibly removed from the
shower during the execution of a search warrant and forced to
lie down, naked, for at least 45 minutes in the presence of
eleven male law enforcement officers, one of whom slapped her
behind, had legally cognizable claim for outrage) aff'd sub nom.
Hutchinson v. Lemmon, 436 F. App'x 210 (4th Cir. 2011).

Viewing the evidence in the light most favorable to the non-moving party, the court concludes that the officers are not entitled to summary judgment on the outrage claim flowing from their conduct during the arrest.  If Weigle's version of events is accepted, at some point one of the officers needlessly used a taser on him, though that assertion is sharply disputed. A number of federal courts have held that the unnecessary use of a taser by law enforcement officers can be the basis for a state law outrage or intentional infliction of emotional distress claim.  See e.g., Cardall v. Thompson, 845 F. Supp. 2d 1182 (D. Utah 2012), Ciampi v. City of Palo Alto, 790 F. Supp. 2d 1077 (N.D. Cal. 2011), Russ v. Causey, 732 F. Supp. 2d 589 (E.D.N.C. 2010) aff'd in part, 468 F. App'x 267 (4th Cir. 2012), Campos v. City of Merced, 709 F. Supp. 2d 944 (E.D. Cal. 2010). Accordingly, the defendants are not entitled to summary judgment on Weigle's first outrage claim.

## 3. Negligence

To succeed on a negligence claim in West Virginia, a plaintiff must "show four basic elements: duty, breach, causation, and damages."  Hersh v. E-T Enterprises, Ltd. P'ship, 232 W. Va. 305, 310 (2013) superseded by statute on other grounds as recognized in Tug Valley Pharmacy, LLC v. All Plaintiffs Below In Mingo County, --- S.E. 2d --- (W. Va. May

36

13, 2015).  As evidenced by the court's prior discussion of
Weigle's assault, battery, and outrage claims, not all tortious
acts which injure a plaintiff constitute negligence.  <u>See also</u>
<u>Mandolidis v. Elkins Indus., Inc.</u>, 161 W. Va. 695, 705
(1978)("The law of this jurisdiction recognizes a distinction
between negligence, including gross negligence, and wilful,
wanton, and reckless misconduct. The latter type of conduct
requires a subjective realization of the risk of bodily injury
created by the activity and as such does not constitute any form
of negligence."), superseded by statute on other grounds as
recognized in <u>Wetzel v. Employers Service Corp. of West</u>
<u>Virginia</u>, 221 W. Va. 610 (2007); <u>Criss v. Criss</u>, 177 W. Va. 749,
751 (1987)(recognizing a distinction between "an intentional
tort" and "a negligent tort").

     Weigle's complaint contains several counts which
purport to set forth negligence claims.  Count One begins by
stating that "[the officers] owed Plaintiff a duty of reasonable
care." Pl. Compl. ¶ 35.  It then describes this duty, stating
that "[the Officers] are liable for negligently failing to
comply with federal constitutional standards for use of force
against a suspect[.]"  <u>Id.</u> ¶ 38.

     Count One also sets forth a negligence claim against
the City, stating "[p]ursuant to West Virginia Code § 29-12A-

4(c)(2) . . . the City of Vienna [is] liable for the injury to Plaintiff caused by [the officers] while acting within the scope of their employment." The code section cited by Weigle reads pertinently:

> Political subdivisions are liable for injury, death, or loss to persons or property caused by the negligent performance of acts by their employees while acting within the scope of employment.

W. Va. Code § 29-12A-4(c)(2).

In his briefing, Weigle states that the negligence claim against the officers flows from their "bad faith and reckless disregard" for Weigle's "well-being and his Fourth Amendment rights." Pl. Resp. in Opp'n at * 7. Weigle also suggests that the officers' decision to "escalat[e]" the traffic stop could be deemed "reckless" or constitute an act done "in bad faith." Id. These arguments are clearly an effort to characterize the officers' conduct as falling within the ambit of W. Va. Code § 29-12A-5, which provides that the employee of a political subdivision is immune from civil liability unless, inter alia, "his or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." W. Va. Code § 29-12A-5(b)(2).

However, "a mere allegation of negligence does not turn an intentional tort into negligent conduct." Benavidez v.

38

United States, 177 F.3d 927, 931 (10th Cir. 1999).  Conduct that
supports a negligence claim can be distinguished from conduct
that supports an intentional tort claim by examining the
subjective intent of the alleged tortfeasor.  "Intentional
torts, as distinguished from negligent or reckless torts . . .
generally require that the actor intend 'the consequences of an
act,' not simply 'the act itself.'"  Kawaauhau v. Geiger, 523
U.S. 57, 62 (1998)(emphasis in original)(quoting Restatement
(Second) of Torts § 8A, Comment a, p. 15 (1964)).

        It is apparent, from both the allegations in the
complaint and from the remainder of the record, that the
officers intended the consequences of their actions during
Weigle's arrest.  That is, their efforts, including the
complained-of use of force, were undertaken for the purpose of
completing Weigle's arrest.  Thus, while the officers' actions
may give rise to an intentional tort, they cannot support
liability predicated on negligence.  See e.g., Brown v. J.C.
Penney Corp., 521 F. App'x 922, 924 (11th Cir. 2013)(per
curiam)("A claim for negligence cannot be premised solely on a
defendant's alleged commission of an intentional tort.").
Accordingly, both Pifer and Ingraham are entitled to summary
judgment on the negligence claim against them set forth in Count
One.

The negligence claim against the City alleged in Count One is, as noted above, predicated on W. Va. Code § 29-12-4(c)(2), which extends vicarious liability to political subdivisions for negligent acts committed by employees of the subdivision acting within the scope of their employment. Because the negligence claim against the City is wholly dependent upon the unviable negligence claim against the officers, Weigle's negligence claim against the City cannot proceed. Accordingly, summary judgment in favor of the City is appropriate.

4.   Negligent infliction of emotional distress

Count Four of Weigle's complaint asserts a claim for negligent infliction of emotional distress. Pl. Compl. ¶ 56-59. The complaint alleges that the officers were "negligent in physically assaulting [Weigle]" and that Pifer was also negligent "in appearing at [Weigle]'s home . . . verbally assaulting . . . and intimidating him." Id. ¶ 57.

West Virginia recognizes negligent infliction of emotional distress as a viable cause of action. See Syl. pt. 1, Heldreth v. Marrs, 188 W. Va. 481 (1992). However, as discussed above, the conduct of the officers during Weigle's arrest (and Pifer's conduct during the incident two months after Weigle's

arrest) was not only intentional, it was purposeful. Simply put, the complained-of conduct might serve as the basis of an intentional tort claim but it cannot sustain a claim based on negligence. Accordingly, summary judgment in favor of the defendants on Weigle's negligent infliction of emotional distress claims is warranted.

### 5.   Malicious Prosecution

Weigle originally brought malicious prosecution claims against both Pifer and Ingraham in Count Seven, see Pl. Compl. ¶ 74, but Weigle now concedes that Ingraham is not liable. See Pl. Resp. in Opp'n at * 11 ("Plaintiff concedes that Sgt. Ingraham is not liable under a claim of malicious prosecution. However, under the law set forth in Defendants' memorandum, Sgt. Pifer clearly is."). The count will thus be dismissed to the extent that it pertains to Ingraham, leaving the court to consider the plaintiff's claim against Pifer.

In West Virginia, malicious prosecution has four elements. Syl. pts. 1-2, Norfolk S. Ry. Co. v. Higginbotham, 228 W. Va. 522, 523 (2011). To succeed on such a claim, a plaintiff must show that the prosecution was: 1) malicious, 2) unsupported by reasonable or probable cause, 3) terminated in favor of the plaintiff, and 4) procured by the defendant. Id.

(citing Syl. pt. 1, <u>Preiser v MacQueen</u>, 177 W. Va. 273 (1985) and Syl. pt. 3, <u>Truman v Fidelity & Casualty Co. of New York</u>, 146 W.Va. 707 (1961)).

   The defendants contend that the "procurement" element was not satisfied in this case.  <u>See</u> Def. Mem. of Law in Supp. Mot. for Summ. J. at * 15.  In <u>Higginbotham</u>, the Supreme Court of Appeals explained that:

> [I]t is apparent that procurement within the meaning of a malicious prosecution suit requires more than just the submission of a case to a prosecutor; it requires that a defendant assert control over the pursuit of the prosecution.

228 W. Va. at 528 (citing <u>Vinal v. Core</u>, 18 W.Va. 1 (1881)). Looking to <u>Vinal</u> for further guidance as to what sort of conduct constituted procurement, the Court explained that, "to prove procurement . . . [a plaintiff] must . . . show[] that the defendant[] engaged in consult[ation]. . . regarding the prosecution, . . . participated in the prosecution, and that the prosecution was carried out under the defendants' countenance and approval.  <u>Higginbotham</u>, 228 W.Va. at 528.  However, the court also noted that "the level of control necessary to prove procurement is not explicitly delineated in our case law."  <u>Id.</u>

   The record here reveals that Pifer was significantly involved in the process of initiating the prosecution of Weigle.

He started the process by completing a "CDR . . . that explains the — the [identity of] defendant, [and] the charges against the defendant" which was "for Wood County Magistrate Court."  Pifer Dep. at 97.  He also filed a criminal complaint containing both "the legal language . . . and the narration of the incident" that "detailed the charges."  Id. at 98.  Based on exchanges during his deposition, he also appears to have had some amount of control over the nature of the charge that was filed.

> Question: So you completed a criminal complaint . . . . [t]hat detailed the charges?
>
> Answer: Yes.
>
> Question: Which were what?
>
> Answer: I believe the charge was obstruction . . . I'd have to look.
>
> Question: At some point did you charge Mr. Weigle with failing to provide his license?
>
> Answer: That was the obstruction charge I believe I ended up with.
>
> Question: Okay. But he did provide his license?
>
> Answer: I'm sorry. You're — you're correct. Not his license, his registration and insurance.
>
> Question: Did — did the charges ever change? Did you amend the charges against Mr. Weigle at some point?
>
> Answer: No.

Id. at 98-99.  Subsequently, Pifer testified on behalf of the prosecution in Weigle's trial in magistrate court, see Mag. Ct.

43

Tr.[13] at 28, then again in his appeal in Wood County Circuit
Court, see Cir. Ct. Tr. at 33.  This level of involvement,
particularly the fact that Pifer drafted the criminal complaint
that resulted in Weigle facing criminal charges in magistrate
court, seems sufficient to be the participation, countenance,
and approval that was found to constitute control by the Supreme
Court of Appeals in Vinal and found to be lacking in
Higginbotham.


        But even if Pifer's involvement was insufficient to
establish the requisite amount of control over the prosecution
to satisfy the definition set forth in Vinal and cited
approvingly by Higginbotham, it is possible for a malicious
prosecution claim against Pifer to survive.  In Higginbotham,
the Supreme Court of Appeals noted that West Virginia precedent
"regarding the amount of control over a prosecution a defendant
must have before it can be found to have procured that
prosecution" is "admittedly limited."  228 W.Va. at 529.
Rather than providing a comprehensive definition of the sort of
conduct that represented control sufficient to constitute
procurement, the court looked to other jurisdictions that had

---

[13] The full transcript of the bench trial before Wood County
Magistrate Robin Waters is attached as "Exhibit D" to Weigle's
response in opposition. (ECF 46-4).

                            44

"explored the topic in more detail," to provide examples of conduct that would qualify, and in doing so, delineated several exceptions to control-based procurement.  Most prominently, the court cited a decision of the Supreme Court of Texas for the proposition that there is:

> no procurement when 'the decision whether to prosecute is left to the discretion of another person, a law enforcement officer or the grand jury. [. . .] An exception [. . .] occurs when a person provides information which he knows is false to another to cause a criminal prosecution.'

Higginbotham, 228 W. Va. at 529 (quoting Browning–Ferris Industries, Inc. v. Lieck, 881 S.W.2d 288, 292 (Tex.1994)) (emphasis omitted).  The court also cited a case from Ohio for the proposition that "there is no procurement when 'an informer merely provides a statement of his belief of criminal activity and leaves the decision to prosecute entirely to the uncontrolled discretion of the prosecutor.'"  Id. (quoting Robbins v. Fry, 72 Ohio App.3d 360, 594 (1991)).

The citations in Higginbotham make it clear that West Virginia embraces the "false information" exception articulated in Lieck.  Higginbotham, 228 W. Va. at 529 (quoting Lieck, 881 S.W.2d at 292).  This exception is also discussed in the other cases cited in Higginbotham, cases which are described as complementing "the meaning and spirit of our law." See Weststar

Mortg. Corp. v. Jackson, 133 N.M. 114, 121 (2002)(noting that a "defendant can be regarded as an instigator of a proceeding if he . . . communicates material information falsely or inaccurately and the prosecutor relies on his statement"), Robbins, 72 Ohio App. 3d at 362 (noting that an individual's protection from malicious prosecution liability "can be lost" if he "provides false information.")(both cited in Higginbotham, 228 W. Va. at 529).

     The parties in this case disagree about the exact nature and sequence of the events that occurred before and during the officers' arrest of Weigle.  The difference in the two accounts is not great, but neither is it immaterial.  If the jury chooses to completely credit Weigle's version of events, they could also conclude that the differences between that account and Pifer's were the product of Pifer's intentional misrepresentations.  If the jury so believed, then Pifer's conduct would fit within the "false information" exception articulated in Higginbotham and Lieck.  Pifer's role in the initiation and prosecution of the magistrate court proceedings consisted of his drafting and filing of the criminal complaint, his initial exercise of discretionary authority concerning which charge to file, and his subsequent testimony.  Even if these efforts were found not to constitute procurement, a reasonable

jury adopting Weigle's account of events could conclude that Pifer knowingly provided false information to the prosecutor and thereby procured Weigle's prosecution.

Pifer also contends that Weigle's claim cannot succeed because the prosecution was supported by probable cause.  See Def. Mem. of Law in Supp. Mot. for Summ. J. at * 15.  He claims that the existence of probable cause is supported by the Wood County Prosecuting Attorney's Office decision "not only to prosecute the case in magistrate court" but also to "pursue the case through a de novo . . . appeal in circuit court."  Id.

Under West Virginia law regarding malicious prosecution, "[p]robable cause . . . is such a state of facts and circumstances known to the prosecutor personally or by information from others as would in the judgment of the court lead a man of ordinary caution, acting conscientiously, in the light of such facts and circumstances, to believe that the person charged is guilty."  Syl. Part 3, Morton v. Chesapeake and Ohio Ry. Co., 184 W. Va. 64, 65 (1990)(citation omitted). "[T]he question of the existence of probable cause depends on the defendant's honest belief of guilt on reasonable grounds," rather than whether a court or other authorities believed that probable cause existed.  See Morton, 184 W. Va. 64, 67; see also Restatement (Second) of Torts § 662 and comments (a), (f)

47

(noting that standard of probable cause is assessed based on
procurer's beliefs, and noting that "[t]he question of probable
cause is to be determined in the light of those facts that <u>the</u>
<u>accuser</u> knows or reasonably believes to exist at the time when
he acts")(emphasis added).  In <u>Morton</u>, for example, the court
considered whether a private individual who notified authorities
that a crime had been committed, and thereby led those
authorities to issue arrest warrants, had probable cause to
believe that crime was afoot.  <u>Id.</u> at 67-68.

     In this case, the element of probable cause refers to
what Pifer reasonably believed about Weigle's behavior.  As
described in detail above, Pifer's position is that he himself
saw Weigle committing a criminal act.  If so, Pifer plainly had
probable cause to believe that a crime had been committed.
Weigle contends that the officers, including Pifer, are lying
about what happened, and he insists that no criminal act was
committed.  When there are inconsistent accounts of the same
factual occurrence, the jury, exercising its role as the arbiter
of credibility, must determine which account to believe.  <u>See</u>
<u>United States v. Tate</u>, 633 F.3d 624, 629 (8th Cir.
2011)(describing the jury as "the final arbiter of witness
credibility" and noting, therefore, that they were "free to
believe" the testimony of one witness and "disbelieve" the

testimony of others).  If a jury believes Weigle's testimony, and is convinced that Pifer is not being truthful, then it could find that Pifer did not have an "honest belief of [Weigle's] guilt on reasonable grounds," and thus that he had no probable cause to believe that Weigle had committed a crime.

In Pifer's view, the evidence shows that he "did not maliciously file the charges."  <u>See</u> Def. Mem. of Law in Supp. Mot. for Summ. J. at * 15.  In an action for malicious prosecution, "malice" is "any sinister or improper motive other than a desire to punish the party alleged to have committed the offense."  <u>Truman</u>, 146 W. Va. at 722.  West Virginia courts have repeatedly ruled that "malice may be inferred by a lack of probable cause."  <u>Morton</u>, 184 W. Va. at 67 (citing <u>Truman</u>, 146 W. Va. at 723-24).  Since the jury in this case may find that Pifer lacked probable cause, it may also infer, based on that finding, that he acted with malice.

Thus, all elements of malicious prosecution could be established at trial.  Given Pifer's actual involvement in preparing documents for Weigle's prosecution, as well as West Virginia's acceptance of the "false information" exception, a jury could find that Pifer procured Weigle's prosecution. Because a jury could believe Weigle's version of events rather than Pifer's, and thereby find that Pifer lied about the

incident, it could find that he had no probable cause when he procured the prosecution.  And since it is undisputed that the prosecution of Weigle terminated in his favor, and a jury could find that Pifer acted "maliciously," it is possible for Weigle to satisfy all four requirements in the test set forth in Higginbotham.  Accordingly, Pifer is not entitled to summary judgment on the malicious prosecution claim.

6.  **Excessive Force**

In Counts Eight and Nine, Weigle raises excessive force claims under Section 1983 based on violations of the Fourth and Fourteenth Amendments.  As explained in n.2, supra, Weigle now concedes that his claims are not cognizable under the Fourteenth Amendment because the relevant conduct that he has alleged took place during an arrest.  The court will thus dismiss the excessive force claims brought in Count Nine.

The officers contend that they are entitled to summary judgment on the Fourth Amendment claim brought in Count Eight because the amount of force used was objectively reasonable.  As discussed at length with respect to the officers' invocation of qualified immunity, there are genuine issues of material fact that preclude the court from making a determination respecting the reasonableness of the force used during Weigle's arrest.

Accordingly, the officers are not entitled to summary judgment
with respect to Weigle's excessive force claim based on Fourth
Amendment violations.

7.   <u>Negligent Retention</u>

Count Two of Weigle's complaint alleges a common law
negligence claim against the City, one best characterized as a
claim for negligent retention.   <u>See</u> Pl. Compl. ¶ 42-45.

In <u>McCormick v. W. Virginia Dep't of Pub. Safety</u>, the
West Virginia Supreme Court of Appeals explained that a claim of
negligent retention involves the following inquiry:

> [W]hen the employee was hired or retained, did the
> employer conduct a reasonable investigation into the
> employee's background vis a vis the job for which the
> employee was hired and the possible risk of harm or
> injury to co-workers or third parties that could result
> from the conduct of an unfit employee? Should the
> employer have reasonably foreseen the risk caused by
> hiring or retaining an unfit person?

<u>McCormick v. W. Virginia Dep't of Pub. Safety</u>, 202 W. Va. 189,
193 (1998)(per curiam), <u>see</u> <u>also</u> <u>State ex rel. W. Virginia State</u>
<u>Police v. Taylor</u>, 201 W. Va. 554, 560 n. 7 (1997)(noting that
"[t]his Court has recognized a cause of action based upon
negligent hiring" and collecting authority), cited in <u>McCormick</u>,
202 W. Va. at 193.  The court also stated that the outcome of
this inquiry would depend upon "the nature of the employee's job

51

assignment, duties and responsibilities," and that "the employer's duty with respect to hiring or retaining increas[ed] as the risks to third persons associated with a particular job increase." McCormick, 202 W. Va. at 194.

Weigle's negligent retention claim focuses on the City's actions with respect to Pifer.  The City contends that Weigle's claim "has no merit" because Weigle cannot establish that Pifer "acted unlawfully in the first place."  Def. Mem. of Law in Supp. Mot. for Summ. J. at * 9.  This argument is unavailing at this juncture, because as discussed above, there is a material dispute of fact as to whether or not Pifer's actions during Weigle's arrest constitute an unconstitutional use of excessive force.  The City also contends that Weigle's claim cannot succeed because he "failed to present any credible evidence that the City had notice that Sgt. Pifer was an unfit employee such that it should have foreseen that he would injure third-parties such as [Weigle]."  Id. at * 10.  Weigle counters that the City should have "reasonably foreseen the risk that Sgt. Pifer would exert excessive force against citizens" because Pifer "received more complaints against him than did other officers."  Pl. Resp. in Opp'n at * 9.  Weigle also highlights Pifer's "inability to control his temper" and "propensity to violence" by making reference to the "Matt Darling incident."

Pl. Resp. in Opp'n at * 9.

The Matt Darling incident was a specific complaint lodged against Pifer that concerned allegations of a verbal and physical altercation in which Pifer and Darling were involved in 2010.  <u>See</u> Pifer Dep. at 130-33.  Pifer accused Darling of having an affair with his wife and causing his divorce.  <u>Id.</u> Pifer, who was off-duty at the time, confronted Darling outside of Darling's parent's house and admits to having "called [Darling] a few choice names."  <u>Id.</u>  Darling attempted to retreat from the confrontation and Pifer followed him.  <u>Id.</u> Pifer caught up with Darling and "got into his face," confronting Darling about ruining his family and marriage, and telling Darling that he "hope[d] he rotted in hell."  <u>Id.</u> Darling's parents filed a complaint against Pifer, in which they alleged that Pifer "shoved down [Darling]'s mother . . . roughed up [Darling's] father, and . . . beat up [Darling.]."  <u>Id.</u>  The complaint was investigated by the West Virginia State Police and no criminal charges were ever filed, but Pifer was suspended by the Chief of the Vienna Police Department for four days due to "conduct unbecoming of a police officer."  <u>Id.</u>

The risk to third parties posed by police work is considerable.  <u>See</u> <u>Woods v. Town of Danville, W.V.</u>, 712 F. Supp. 2d 502, 514 (S.D.W. Va. 2010)(holding that a West Virginia

police department had a "heightened" duty to investigate when making hiring or retention decisions "due to the nature of police work," and making note of the risk that arises from the fact that police officers are "permitted to carry guns, use necessary force to effect arrest, and enter civilian residences in certain circumstances."). Thus, the duty to investigate potentially dangerous applicants and review the questionable activities of current police employees is commensurably high.

Nevertheless, to the extent Weigle' negligent retention claim is predicated on the City's decision to hire Pifer, the claim is not sufficiently supported by the facts in the record. Although the record does not provide details of the City's process for hiring police officers, even the most meticulous, thorough review of an applicant's background cannot reveal risks that do not exist. The record contains no evidence related to Pifer's background that should have raised red flags for the City during the hiring process. After graduating from high school in 1987, Pifer obtained an associate's degree from Parkersburg Community College, then a bachelor's degree from West Liberty University, both in criminal justice. Pifer Dep. at 7. He spent one semester pursuing a master's degree in criminal justice at Marshall University, but cut short his studies to take a job as a counselor at the West Central

Regional Juvenile Detention Center in Parkersburg. Id. at 9.
After working for approximately a year at the Juvenile Detention
Center, he applied for, was offered, and accepted a position at
the Vienna Police Department. Id. at 13. There is no evidence
that Pifer had a criminal record, or that he had been the
subject of any complaints during his time working at the
Juvenile Detention Center. Id. at 12. Moreover, at some
unspecified time after he was hired by Vienna, he was
subsequently contacted by the police department of Baltimore,
Maryland, where he had previously applied, "to see if [he]
wanted to pursue a career there." Id. at 14. At worst, this
evidence demonstrates that there was nothing remarkable or
noteworthy in Pifer's background that might have put the City on
notice that Pifer potentially posed a danger to third parties if
hired as a police officer. At best it suggests he was a highly
attractive candidate for such a position. Accordingly, to the
extent Weigle's negligent retention claim is predicated on the
City's decision to hire Pifer, it fails as a matter of law.

The City's decision to retain Pifer after the various
complaints lodged against him is also justified. In addition to
the Darling incident, there is evidence in the record that the
City was aware that Pifer had, on several occasions, acted
unprofessionally during traffic stops. See Pifer Dep. at 19

(explaining that the chief of police investigated potential
disciplinary issues by meeting with individual officers on an
"as-needed" basis and explaining that "the chief would bring you
into the office and speak to you" if "there was a complaint
against you"; Pifer was asked if he "ever had one of those
meetings" and he answered, "Oh, I had more than one."), id. at
26 (acknowledging that the "general[] context of the complaints"
made against Pifer "usually revolved around people being upset
with how [he] would conduct a traffic stop"), id. at 21-22
(discussing the verbal warnings issued to Pifer by his
superiors, including the chief of police, to "be polite and
professional on all traffic stops, and not use profanity."), id.
at 40-43 (Pifer stated that he was the subject of "generally
about three – two to three" of such complaints "about [his]
demeanor" per year and admitted that it seemed that he was the
subject of more such complaints than his fellow officers).

However, there is also evidence that the number of
complaints against Pifer, while relatively high compared to his
colleagues, was more a byproduct of the fact that Pifer's
primary duty was traffic patrol, where he spent "the majority"
of his time. See id. at 26 (Pifer explaining that he conducted
a high number of traffic stops because "the majority of patrol
in Vienna" involved making traffic stops), id. at 31 (noting

that Pifer's superiors placed an emphasis on the quantity of traffic stops and that they were constantly encouraging him to "do more traffic," which he explained meant they wanted him to make "more traffic stops"). Additionally, other than the complaints concerning his comportment during traffic stops and the Darling incident (which occurred while Pifer was off-duty), the record contains no evidence that Pifer was prone to violence or was otherwise likely to use excessive force during the course of his official duties. Consequently, the court finds that the City could not have reasonably foreseen that continuing to employ Pifer represented a sufficiently abnormal risk that the decision to do so is actionable.

Accordingly, the City is entitled to judgment as a matter of law as to the common law negligent retention claim set forth in Count Two.

8.   <u>The Monell Claims</u>

Section 1983 provides a cause of action to individuals whose constitutional or federal statutory rights have been violated by a person acting under the purported authority of one of the sovereign states. 42 U.S.C. § 1983 ("Every person who . . . causes . . . [a] deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party

injured"), see Hafer v. Melo, 502 U.S. 21, 27 (1991)("Through §
1983, Congress sought 'to give a remedy to parties deprived of
constitutional rights, privileges and immunities by a [state]
official's abuse of his position.'")(quoting Monroe v. Pape, 365
U.S. 167, 172 (1961)).

A state's political subdivisions, including
municipalities and other local governmental units, are
considered "persons" for the purposes of Section 1983.  Monell
v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  Although local
governments are amenable to suit under Section 1983, they cannot
be held vicariously liable.  Id. at 694 ("[A] local government
may not be sued under § 1983 for an injury inflicted solely by
its employees or agents.").  A local government only faces
liability under Section 1983 when:

> [The] execution of [the] government's policy or custom,
> whether made by its lawmakers or by those whose edicts
> or acts may fairly be said to represent official policy,
> inflicts the injury that the government as an entity is
> responsible under § 1983.

Id.  That is, for Section 1983 liability to extend to a local
government, the government's policy or custom must be the
"moving force" that resulted in the constitutional violation.
Id., see also Bd. of County Comm'rs of Bryan County, Oklahoma v.
Brown, 520 U.S. 397, 404 (1997)("As our § 1983 municipal
liability jurisprudence illustrates . . . it is not enough for a

§ 1983 plaintiff merely to identify conduct properly
attributable to [a] municipality. The plaintiff must also
demonstrate that, through its deliberate conduct, the
municipality was the 'moving force' behind the injury alleged.")

        "A policy or custom for which a municipality may be
held liable can arise in four ways: (1) through an express
policy, such as a written ordinance or regulation; (2) through
the decisions of a person with final policymaking authority; (3)
through an omission, such as a failure to properly train
officers, that 'manifest[s] deliberate indifference to the
rights of citizens'; or (4) through a practice that is so
'persistent and widespread' as to constitute a 'custom or usage
with the force of law.'" Lytle v. Doyle, 326 F.3d 463, 471 (4th
Cir. 2003)(internal citations omitted).

        In Count Ten of his complaint, Weigle lays out his
Monell claims against the City.  He states that the City
"developed and maintained policies or customs," including the
"tacit[] approv[al] of the improper use of excessive force [and]
the improper use of pepper spray and taser guns."  Pl. Compl. ¶
100.  Count Ten also alleges that it was "the policy and custom
of the [City] to inadequately and improperly hire, train or
supervise its police officers, including [Pifer and Ingraham]."
Id. ¶ 101.  Specifically, the City "improperly tolerated and

implicitly approved of acts of misconduct by its officers; did not require appropriate in-service training or re-training of officers who were known to have engaged in police misconduct; and failed to properly investigate complaints against said officers." Id.  Weigle further alleges that "as result of the above-described policies and customs, [Vienna] police officers . . . including [Pifer and Ingraham] . . . believed that their actions would not be properly monitored by supervisory officers and that misconduct would not be investigated or sanctioned, but rather would be tolerated." Id. ¶ 103.  Finally, Weigle contends that the City, "acting under color of law and pursuant to official policy or custom . . . knowingly, recklessly, or with gross negligence, failed to train, supervise, control and discipline[,] on a continuing basis[,] the Defendant police officers." Id. ¶ 104.  This pleading reveals that Weigle has alleged three separate Monell claims: one based on the decision to hire the officers, one based on the alleged failure to train them, and one based on the inadequacies of the City's supervisory policies.

   a.  Hiring

       A political subdivision can face Section 1983 liability based on its decision to hire an employee who subsequently violates a plaintiff's constitutional rights.  See

**Brown**, 520 U.S. 397.  Indeed, "constitutional injuries allegedly traceable to an ill-considered hiring decision pose the greatest risk that a municipality will be held liable for an injury that it did not cause."  Id. at 415.  Because Section 1983 does not permit local governments to be held vicariously liable, such claims are only permissible if the plaintiff can satisfy "rigorous standards of culpability and causation."  Id. at 405. To succeed, the plaintiff must show that the local government's hiring process would lead a "reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire [an] applicant" would likely be the "deprivation of a third party's federally protected right."  Id. at 411.  Speaking specifically about a Monell claim in which the plaintiff alleged that the decision to hire a police officer resulted in the plaintiff being subjected to unconstitutionally excessive force, the Brown court said:

> [A] finding of [local government] culpability simply cannot depend on the mere probability that any officer inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that th[e] officer [who used excessive force] was highly likely to inflict the particular injury suffered by the plaintiff. The connection between the background of the particular applicant and the specific constitutional violation alleged must be strong.

Id. at 412.  That is, to assert a cognizable Monell claim in this context requires the plaintiff to proffer evidence

demonstrating that the government official responsible for the hiring decision should have concluded, after a review of the officer's record at the time of hiring, that it was highly likely that hiring that person would result in a future constitutional violation. Id. at 412-13.

As discussed in section 7, Weigle has not put forth any evidence concerning the process that the City employed when it made the decision to hire Pifer or Ingraham, and nothing in the record suggests that either officer's background presented the obvious risk that their hiring would result in the deprivation of citizens' constitutional rights. Thus, Weigle has not and cannot meet the "highly likely" evidentiary burden articulated above. The City is entitled to summary judgment on Weigle's Monell claim arising from the decision to hire either Pifer or Ingraham.

b. Failure to Train

In City of Canton, Ohio v. Harris, the Supreme Court held "that the inadequacy of police training may serve as the basis for § 1983 liability" in cases where "such inadequate training can justifiably be said to represent 'city policy.'" 489 U.S. 378, 388, 390 (1989). The Court explained that, because liability under Monell must be based on a "city policy,"

it could attach "where — and only where — a deliberate choice to follow a course of action is made from among various alternatives by city policymakers." Id. at 389 (citation omitted).  In the failure-to-train context, a city "policy" can be discerned "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. at 388.

The Court elaborated on the "deliberate indifference" standard, writing that:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

Id. at 390.  The Court gave an example of a situation where police officers who were not trained regarding the "constitutional limitations on the use of deadly force." Id. at 390 n.10.  Because "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons . . . the need to train officers" on this matter "can be said to be 'so obvious' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." Id.  The Court's suggestion is that the city would be liable under its "policy" of failing to provide training in this

63

situation because of an "obvious need," even if it had no direct knowledge of particular constitutional violations by officers.

The Court separately pointed out that, in a second type of situation, "[i]t could also be that the police . . . so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers." Id. Thus, where the city has actual awareness of widespread constitutional violations, its failure to rectify the situation by training may also rise to the level of "deliberate indifference" to its citizens' constitutional rights. See id.

The Fourth Circuit has employed the Canton opinion several times, most recently in Lytle v. Doyle. In Lytle, the court stated that "a failure to train can only form a basis for liability if 'it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations.'" 326 F.3d at 474 (quoting Canton, 489 U.S. at 397 (O'Connor, J., concurring in part and dissenting in part)). Such a pattern has not been shown here. Subsequently, a district court has observed that "the text cited in Lytle . . . is at odds with that part of [Canton] where the majority explained" that liability may also arise where "the need for more or different training is so obvious, and the inadequacy so likely to result

64

in the violation of constitutional rights, that the policymakers" were "deliberately indifferent" on the grounds of "failing to implement new or better training." Brown v. Mitchell, 308 F.Supp.2d 682, 704 (E.D.Va. 2004) (internal citations and quotations omitted).

The Brown opinion noted that "the failure to train claim in [Lytle] was based on the alleged presence of a pattern of constitutional deprivations, not on the alternative mode of satisfying the deliberate indifference standard sanctioned by the [Canton] majority and made explicit by Justice O'Connor's separate [Canton] opinion." Id. at 705. Thus, in the view of the Brown court, the Lytle opinion described the failure-to-train standard as "only" being satisfied by a pattern of violations because it was referring just to the context in which a plaintiff claims that there was a pattern of constitutional violations — not a situation where policymakers should have known training was required because of an "obvious need."

In short, although the Lytle opinion focuses on the second scenario described in Canton, where policymakers have actual knowledge of constitutional violations, it does not thereby foreclose liability in a situation where policymakers fail to institute training for officers who will plainly be engaged in duties that may affect citizens' constitutional

65

rights.  See Canton, 489 U.S. at 390 n.10.  Accordingly, in the present case, plaintiff may prevail on a theory that the city provided inadequate training "in light of the duties assigned to specific officers," and that "the inadequacy [was] so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."

The court indeed finds a genuine dispute over the adequacy of the city's training of its officers.  Weigle contends that there is "ample evidence that the City of Vienna Police Department provided inadequate training."  Pl. Resp. in Opp'n at * 15.  The evidence in the record, taken in the light most favorable to Weigle, supports this statement.

Although it is undisputed that Pifer attended the police academy, there is little information in the record regarding what he learned while there.  Ingraham does state that the academy trained him on "how to make proper traffic stops" and "interact with the public."  Ingraham Dep. at 12-13.  By contrast, the deposition of George Young,[14] the Chief of Police, suggests that attendance at a police academy is not especially helpful for dealing with real-world situations that arise in

---

[14] Attached as Exhibit "E" to Weigle's response in opposition. (ECF 46-5).

policing.  Young Dep. at 18 ("[I]f you have a kid that graduates from college who has never even rode in a police car, he is not going to know the first thing. You get out of the Academy, and you think you know everything until you are faced with that first call, and then you realize how much you don't know.").

Pifer states that he went directly from the academy to his work as a Patrolman, and that the training he received from the Department was limited to "basic rudimentary information from the officers for about a week" through a "ride-along familiarization with the city boundaries" and activities such as how "the gas pumps work" before he was "turned out on [his] own."  Pifer Dep. at 15.  Although Pifer suggested that the Department's policies have changed, and that officers who graduate from the academy may now receive additional training before work, see Pifer Dep. at 14-15, he does not say of what this training consists.  He also does not suggest that the Department provided any kind of remedial instruction for officers who did not receive post-academy training in the first instance.  Moreover, Ingraham's deposition suggests that he did not receive any post-academy training that related to proper conduct at traffic stops or while "interact[ing] with the public."  Ingraham Dep. at 12-13.  Chief Young suggests that he received no training at all between the police academy and the

start of his job.  <u>See</u> Young Depo. at 16 ("I graduated on a
Friday and they gave me the keys to a cruiser and a couple
clipboards, one had a ticket book in it and one was report
forms, and basically told me to have at it.").

Chief Young's testimony, like Pifer's, suggests that
the Department has improved its training policies for new
officers, but his description also suggests that the training
program focuses on practical aspects of the job, and may not
include any information regarding constitutional rights of
suspects.  <u>See</u> Young Depo. at 17-18 ("[W]e will take this new
recruit and typically have him ride around with the other
officers for a few days or a week to observe. . . . Then after
that first few days or a week of observation, then we will put
the new recruit behind the wheel and the [designated training
officer] will, you know, basically they will work together. . .
. They will ride together, go to calls, let the new recruit take
care of the calls.  If there's any questions, he is there, and
then there is a form that we can fill out, you know, basically
check off, okay, he made five traffic stops today, you know, he
did good here, he didn't do this, you know, things of that
nature.).

Chief Young's deposition also refers to the
Department's annual training requirements, which he says include

68

16 hours per year.  Young Dep. at 14.  But Young then suggests
that the officers have wide discretion in choosing the type of
training they undergo, stating that "It can be anything. It can
be firearms instruction. It can be domestic violence training.
It can be anything like that, anything approved by the state,
and I mean, they have a list of it." Id. at 15.  If so, an
officer might be able to avoid training regarding the
constitutional rights of suspects under investigation if he
instead preferred to learn about firearms.  Ingraham's
deposition also suggests that the ongoing training did not
include any material on "how to make a stop or interact with the
public," Ingraham Dep. at 12-13, although he said that he did
receive training on the use of pepper spray and tasers, id. at
19, 21.

        The testimony clearly points both ways.  But a jury
could infer that the officers were given inadequate training
regarding the constitutional rights of suspects who are being
questioned at traffic stops or in similar settings, and, in
particular, on the proper use of force during such interactions.
Based on the doubt raised by Young regarding whether the police
academy supplied adequate training, as well as the merely
rudimentary and practical training from the Department before
assigning officers to duty, a jury could infer that they were

inadequately trained when they began work.  And the ongoing
training at the department may not have covered these subjects,
or it may have allowed officers to avoid them.[15]

          The specific duties of officers such as Pifer may
allow a jury to find liability in light of the Department's
inadequate training.  Pifer's role includes a heavy amount of
interaction with the public, and the Department has encouraged
him to escalate minor incidents into more significant ones.  See
Pifer Dep. at 31-32 (noting that departmental evaluations
encouraged him to "do more traffic," because it will give Pifer
"more contact with people violating the law, people carrying
drugs, people drinking and driving" and that "minor traffic
stops . . . could lead to more larger crimes being apprehended,"
and agreeing with statement that "traffic stop[s] can
escalate").  A jury could infer that, "in light of the duties
assigned to" publicly-engaged officers such as Pifer, the
inadequate training was "so likely to result in the violation of
constitutional rights, that the policymakers of the city can
reasonably be said to have been deliberately indifferent to the
need." Canton, 489 U.S. at 390.  To illustrate this theory of

_____

[15] The jury could also determine that the City had a policy
requiring the relevant training, but that it was its custom to
not enforce that policy.  Cf Marriott v. County of Montgomery,
426 F. Supp. 2d 1, 9 (N.D.N.Y. 2006)("Constitutional words
cannot erase unconstitutional conduct").

liability in <u>Canton</u>, the Supreme Court gave a much more serious example of a city failing to train officers in the use of deadly force against "fleeing felons."  But the rule in <u>Canton</u> focuses on the likelihood of constitutional violations, not on the harmfulness or severity of those violations.  Given that Pifer may have received no relevant training regarding constitutional conduct during frequent public interactions – interactions that he was encouraged to escalate – a reasonable jury could find that constitutional violations were apt to result.

In <u>Canton</u>, the Court also described a causation requirement for failure-to-train liability:

> [F]or liability to attach . . . the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus . . . [an injured plaintiff] must still prove that the deficiency in training actually caused the police officers' [constitutional violation]. Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?

<u>Id.</u> at 391.  The requirement that the "deficiency in training" be "closely related" to the injury, and "actually cause[]" the violation, can be satisfied here.  In this case, a reasonable jury could conclude that officers who were better-trained regarding citizens' constitutional rights would not have escalated a minor traffic stop into a situation involving a forcible arrest, or that they would have used force

71

appropriately during the incident.

It should be noted, however, that Weigle's suggestion that the officers had "no training on local policies and procedures," Pl. Resp. in Opp'n at * 15, will not ground a failure-to-train claim because it cannot satisfy the causation requirement.  Although Pifer's deficient training in constitutional rights, if proven, may well have contributed to constitutional harm, it is difficult to see how a lack of knowledge of the department's policies could have done so. Certainly the plaintiffs have raised no persuasive argument suggesting how this may have happened.  Thus, to be successful in this case, a failure-to-train claim must rest on deficient training in constitutional rights.

Accordingly, the City is not entitled to summary judgment on Weigle's failure to train claim.

c. Failure to Supervise

A political subdivision can be subjected to Section 1983 liability for failing to supervise its employees properly. See Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994), Wellington v. Daniels, 717 F.2d 932 (4th Cir. 1983).  This liability is "not premised upon respondeat superior but upon 'a recognition that

supervisory indifference or tacit authorization of subordinates'
misconduct may be a causative factor in the constitutional
injuries they inflict on those committed to their care.'"  **Shaw**,
13 F.3d at 798 (quoting **Slakan v. Porter**, 737 F.2d 368, 376 (4th
Cir. 1984)).  Supervisory liability can be borne by a
governmental entity even if the plaintiff does not name a
specific supervisory official as a defendant.  **See**, **e.g.**, **Avery
v. Burke County**, 660 F.2d 111 (4th Cir. 1981).  However, when
advancing a failure to supervise claim, "liability ultimately is
determined 'by pinpointing the persons in the decisionmaking
chain whose deliberate indifference permitted the [underlying]
constitutional abuses to continue unchecked.'"  **Shaw v. Stroud**,
13 F.3d 791, 798 (4th Cir. 1994)(quoting **Slakan**, 737 F.2d at
376.).

        In **Shaw**, our Court of Appeals explained that there are
"three elements necessary to establish supervisory liability
under § 1983."  **Shaw**, 13 F.3d at 799.  Those elements are:

> (1) that the supervisor had actual or constructive
> knowledge that his subordinate was engaged in conduct
> that posed 'a pervasive and unreasonable risk' of
> constitutional injury to citizens like the plaintiff;
> (2) that the supervisor's response to that knowledge was
> so inadequate as to show 'deliberate indifference to or
> tacit authorization of the alleged offensive
> practices,'; and
> (3) that there was an 'affirmative causal link' between
> the supervisor's inaction and the particular
> constitutional injury suffered by the plaintiff.

Id.; see also Wilkins v. Montgomery, 751 F.3d 214, 226-26 (4th Cir. 2014)(quoting test articulated in Shaw).

Evidence in the record does suggest that members of the Vienna police department with supervisory power were aware that Pifer had been the subject of numerous complaints. The evidence illustrates, for example, that Pifer had been subjected to oral evaluations because of complaints from the public about his policing. See Pifer Dep. At 19. As previously noted, there is evidence suggesting that many of these complaints involved Pifer's alleged unprofessional attitude and demeanor during traffic stops. Pifer Dep. at 22. The following excerpt from Pifer's deposition describes the complaints:

Question: Did [Chief Deem] ever give you any warnings just verbally in the office or tell you that you should . . . handle something differently? Do you remember what those were or what the context of those were?

Answer: I believe he told me that I needed to be polite and professional on all traffic stops, and not use profanity.

Question: Okay. So I'm going to assume that one of those complaints was about the use of profanity?

Answer: Yes.

Question: Okay. And is — were the other complaints of a similar nature? Was it — did it have to do with your attitude toward a person who was receiving the citation or who had been stopped?

Answer: Generally, yes.

Pifer Dep. at 22. Pifer also stated elsewhere that these complaints typically revolved around persons who were upset that they had received traffic citations. See id. at 25-26 ("Generally, [complaints] usually revolved around people being upset with how I would conduct a traffic stop prior to or if I did issue a citation.") And Pifer agreed with the suggestion that he had "more complaints come in about [him] than other officers" did. See id. at 40-43.

These facts, however, do not satisfy the first prong of the test for supervisory liability that was articulated in Shaw. Nothing in the record suggests that the complaints against Pifer described "conduct that posed 'a pervasive and unreasonable risk of constitutional injury.'" See Shaw, 13 F.3d at 799. The complaints about Pifer that were mentioned in the record are largely related to lack of politeness at traffic stops. Pifer's questionable acts as a police officer, at worst, appear to have involved "the use of profanity." Pifer Dep. at 22. The plaintiffs have not suggested that an officer's use of profanity, without more, could rise to the level of a constitutional injury. Cf. Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001)(noting, in the Fourth Amendment context, that "it seems unlikely that harsh language alone would render a search or seizure

'unreasonable'").  And nothing in the record refers to any previous complaint that Pifer had inappropriately used force against a suspect in the course of his police work.

Pifer allegedly used force in his altercation with Matt Darling, which is discussed above.  See Pifer Dep. at 130-33.  But "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions." Shaw, 13 F.3d at 799.  Thus, even if a future "risk of constitutional injury" was indicated when Pifer acted as a private citizen who was upset about his impending divorce, which is itself questionable, this one incident cannot alone establish a "pervasive" and "unreasonable" risk under the test in Shaw. What is more, the department appears to have taken steps to discipline him for his conduct in that singular incident.  See Pifer Dep. at 130-33.  Supposing, again for the sake of argument, that the Darling incident showed a "risk of constitutional injury," the department's response appears not to have been "so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices."  See Shaw, 13 F.3d at 799.

Plaintiff focuses on the Department's "inadequate practices for handling citizen complaints and internal

76

investigations." Pl. Resp. in Opp'n at * 15.  The problem with
their theory is that prior complaints were largely minor and
would not rise to the level of constitutional injuries, as
explained above.  Had there been a pattern of previous
constitutional violations, a defective system of handling
complaints might help to show that the Department's "response to
[the violations] was so inadequate as to show 'deliberate
indifference to or tacit authorization of the alleged offensive
practices.'"  Shaw, 13 F.3d at 799.  But in the absence of a
supervisor's knowledge of a subordinate's constitutional
violations "at least . . . on several different occasions," a
defective system of complaint investigation cannot, by itself,
ground a claim.[16]

        Plaintiff also mentions, in a heading of its brief,
that "additional discovery is necessary to adequately respond to
Defendants' motion as to Plaintiff's Monell claim."  Pl. Resp.
in Opp'n at * 13.  But plaintiff then provides no further
comments on "additional discovery," and does not give any reason

---

[16] Weigle discusses, in his deposition, a great number of other
situations in which he believes, largely based on comments from
other persons in the community, that members of the Department
(particularly Pifer) may have committed violations of
individuals' rights.  Weigle Dep. 80-106.  Despite the
seriousness of some of the allegations, they are not developed
or discussed in the briefing on this motion, and, in particular,
do not appear as part of the plaintiff's argument regarding the
Monell claims.  The court will thus not consider them here.

why more discovery would be necessary or helpful in responding. A bald assertion that more facts will be helpful cannot ground a request for more discovery at the time a motion for summary judgment is brought. <u>See</u> Fed. R. Civ. P. 56(d)(allowing additional discovery upon a party's "affidavit or declaration that, for <u>specified reasons</u>, it cannot present facts essential to justify its opposition)(emphasis added).

Accordingly, the City is entitled to summary judgment on the <u>Monell</u> claim predicated on its failure to supervise Pifer.

### IV.   <u>Conclusion and Order</u>

For the reasons set forth above, the defendants' motion for summary judgment is granted in part, and denied in part.   The court summarizes its conclusions below:

The factual record evinces several material disputes of fact.   These factual disputes prevent the court from being able to engage in the objective analysis necessary to determine if the force used by the officers was objectively reasonable or excessive.   Accordingly, the court concludes that the officers are not entitled to summary judgment on the basis of qualified immunity.

The court concludes that the defendants are entitled to summary judgment on the following claims:

- All claims against the City of Vienna Police Department as a named party defendant are dismissed, but this dismissal does not affect the claims against the City of Vienna and its police officers, Pifer and Ingraham;

- All the negligence claims set forth in Count One;

- The negligent retention claim set forth in Count Two;

- The outrage claim in Count Three stemming from Pifer's verbal harassment and threatening statements made to Weigle two months after the arrest;

- All the negligent infliction of emotional distress claims set forth in Count Four;

- The assault claim set forth in Count Five;

- The malicious prosecution claim set forth in Count Seven as it pertains to Ingraham;

- The Section 1983 excessive force claims relying on the Fourteenth Amendment set forth in Count Nine; and

- The Monell claim predicated on the City's decision to hire or retain and to supervise either officer set forth in Count Ten.

In all other respects the motion for summary judgment is denied.

The Clerk is directed to transmit copies of this order to counsel of record and any unrepresented parties.

ENTER: October 14, 2015

John T. Copenhaver, Jr.
United States District Judge